**UNITED STATES DISTRICT COURT**
**DISTRICT OF DELAWARE**

------------------------------------------------------------- X

|  |  |
|---|---|
| RESORTS GROUP, INC., | : |
| | : |
| Plaintiff, | : |
| | : |
| - against - | : |
| | : |
| CERBERUS CAPITAL MANAGEMENT, L.P., | : |
| CRE NIAGARA HOLDINGS, LLC, and | : |
| CLUB EXPLORIA, LLC, | : |
| | : |
| Defendants. | : |
| | : |

Civil Action No. _____

**COMPLAINT**

**JURY TRIAL DEMANDED**

------------------------------------------------------------- X

## COMPLAINT

Plaintiff Resorts Group, Inc. ("RGI"), for its complaint against defendants Cerberus Capital Management, L.P. ("Cerberus"), CRE Niagara Holdings, LLC ("CRE Niagara"), and Club Exploria, LLC ("Club Exploria," and collectively with Cerberus and CRE Niagara, "Defendants") alleges:

## PRELIMINARY STATEMENT

1.      Private equity fund Cerberus—through CRE Bushkill Group LLC ("CRE Bushkill"), CRE Niagara, CRE Niagara Participation Holdings ("CRE Niagara PH," and collectively with CRE Bushkill and CRE Niagara, the "CRE Subisidaries"), and Club Exploria— purchased from RGI a successful resort and timeshare business in the Poconos Mountain region of Pennsylvania ("the Resort") pursuant to agreements that allowed RGI to retain a valuable stream of income flowing from the Resort's existing contracts with its timeshare members (the "Payment Stream"). The value of the Payment Stream depended directly on Defendants' fulfilling their contractual obligation to continue to maintain the established collections, customer service, and contract servicing standards for the Resort that RGI had abided by for over a decade. Shortly after

the acquisition, Cerberus turned over management of the Resort to its newly-acquired subsidiary and alter ego, Club Exploria.  Cerberus, by and through Club Exploria, among other things, mismanaged the Resort and its collections procedures and siphoned the Resort's assets for the benefit of Cerberus and Club Exploria in violation of the parties' agreements, causing significant damage to value of the Payment Stream.  As a result of Defendants' wrongful conduct, RGI has suffered millions of dollars in damages—a figure that is increasing by the day.

2.      RGI—a well-regarded company in the timeshare industry—successfully owned and operated the Resort through RGI's subsidiary Bushkill Group, Inc., between 2006 and 2017. Due to RGI's consistent and established standards of operation and its diligent and ethical collection and customer-oriented policies, it was able to attract and retain timeshare members and maintain a profitable timeshare resort business.

3.      In 2017, RGI decided to sell its interest in the Resort and related timeshare properties to Cerberus—a private equity fund with more than $42 billion in assets under management with a successful track record in the timeshare business.  Cerberus informed RGI that it intended to expand its presence in the timeshare industry through not only its acquisition of the Resort, but also through an undisclosed transaction already in the works.  Cerberus represented to RGI that it intended to maintain all of RGI's key personnel at the Resort to operate as the "Corporate Headquarters" of Cerberus's timeshare holdings, and use the Resort's large offices and data center in Bushkill, Pennsylvania to oversee the operations of Cerberus's subsequent timeshare acquisitions.

4.      In negotiations, RGI and Cerberus agreed on an appropriate valuation for all of the assets Cerberus was purchasing except for one—RGI's ownership interest in the Payment Stream, a portfolio of consumer contracts for the financed purchase of timeshare intervals at the Resort

2

(the "Participation Portfolio"), which RGI and Cerberus projected to pay out approximately $89.6 million dollars over their remaining lifetime.

5.     Unable to reach an agreement on the sale of those contracts, the parties agreed upon a transaction whereby RGI would retain an ownership interest in the Payment Stream, while Cerberus would acquire, with limited exceptions, all other assets outright.  To protect RGI's interest in this Payment Stream by aligning the parties' interests, Cerberus—through its subsidiary and alter ego CRE Bushkill—also received an ownership interest in a portion of the Payment Stream, but those payments would be deferred until an existing hypothecation loan secured by the Participation Portfolio, upon which RGI would remain the borrower and guarantor, was paid in full.

6.     Crucially, RGI also negotiated highly specific obligations and commitments from Cerberus—acting through its alter egos, the CRE Subsidiaries—concerning the consistent and established standards by which the Resort would be run and how the timeshare contracts would be serviced to ensure that the obligors maintained their commitments.  RGI negotiated these terms because it knew from its significant experience in the timeshare industry that if customer satisfaction at the Resort and related timeshare properties was reduced, there would be a directly correlated reduction in customers paying according to the terms of their timeshare contracts.  These service commitments were absolutely vital to RGI's agreement to the overall structure of the transaction.

7.     At that same time, RGI and Cerberus also negotiated and agreed upon the projections for the $89.6 million dollars in revenue likely to be received over the remaining life of the Participation Portfolio.  Cerberus conducted substantial due diligence on the projections, among other things, retaining an outside expert in timeshare finance, collections, and

3

securitizations to underwrite the portfolio and audit those projections by examining the finances as well as RGI's servicing and collections policies and procedures, as well as a forensic accounting expert to conduct a quality of earnings analysis. The parties arrived at a schedule of projections that was reasonable, and conservative, in light of RGI's historical track record and Cerberus's promise to run the Resort, at a minimum, at the same standards as they had been run under RGI. RGI further negotiated an agreement by which it would receive increased, but non-exclusive, rights if those conservative revenue projections were not met, including the right to provide directives to Defendants on how to remedy the shortfall.

8.     After many months of meetings, due diligence and negotiations, the terms of the sale were formalized into a unit and asset purchase agreement with CRE Niagara, dated May 19, 2017 (the "UAPA"), that was executed in May 2017 by RGI and Cerberus's subsidiary, CRE Niagara. In May 2017, RGI also entered into a participation agreement (the "Participation Agreement") and separate servicing agreement ("Servicing Agreement" and together with the UAPA and Participation Agreement, the "Transaction Agreements") with CRE Bushkill, to which CRE Niagara was not a direct party. CRE Niagara agreed to be bound by the Servicing Agreement and Participation Agreement, making its agreement to the UAPA "subject to the terms and conditions of" those agreements, which were attached as exhibits to the UAPA.

9.     Cerberus conducted all negotiations on behalf of its subsidiaries, thereby manifesting its intent to be bound by the terms of the Transaction Agreements. Indeed, one of the Transaction Agreements expressly acknowledged that (i) Cerberus's "wholly-owned subsidiaries" and "other Affiliates"—such as CRE Niagara—"are Controlled, directly or indirectly, by Cerberus Capital Management LP."

10.     Following the closing of the sale, operations at the Resort and related timeshare properties went well for the first few months.  During that time there was no significant increase in customer complaints or reduction in expected revenue.  That all, however, changed beginning in November 2017.

11.     Beginning in November 2017, it became apparent that Cerberus's assurances that the Resort in Bushkill, Pennsylvania would act as the "Corporate Headquarters" of Cerberus's timeshare holdings and that Cerberus would maintain the Resort's personnel—assurances intended to induce RGI into entering into the UAPA—were false when made.  Cerberus announced then that it had acquired Club Exploria—a regional timeshare operator with its primary operations in Florida and a track record of poor customer reviews, which was in significant financial distress— and that the Resort would fall under Club Exploria's brand and management.

12.     Cerberus intended to use Club Exploria as its alter ego for managing all of its timeshare holdings, including those of Cerberus's other alter egos, the CRE Subsidiaries.  Club Exploria, in turn, would operate those timeshare holdings without respect to what entity technically held title to those properties.  Upon information and belief, the CRE Subsidiaries were merely holding companies for Cerberus and Club Exploria with no independent business operations of their own.  Indeed, an announcement to Resort employees signed by J. Richard Budd, of Cerberus, stressed that the Resort was to be "integrated" into the Club Exploria brand and that Club Exploria and CRE Bushkill should operate as "ONE TEAM."

13.     Upon information and belief, Cerberus acquired Club Exploria by using significant leverage that would further restrict Club Exploria's future borrowing ability and, as a result, Club Exploria was in desperate need of cash to turn around its finances.  It soon became clear that Cerberus's true plan from the outset was to exploit and siphon the Resort's resources and member

5

contracts, including its credit line, for the benefit of the much larger Club Exploria, and to the detriment of the Payment Stream. Had RGI known this was Cerberus's plan at the time, and that Cerberus's representations were false when made, it never would have entered into the transaction, because the larger timeshare operator would not service the Participation Portfolio underlying the Payment Stream at the same consistent and established standards as RGI.

14.    Once Cerberus—through its alter ego and wholly-owned subsidiary Club Exploria—took over operations at the Resort, it caused CRE Bushkill to make a number of immediate and harmful changes to the Resort, which materially violated the standards to which CRE Bushkill had contractually agreed to adhere. Among other changes, Defendants reduced amenity hours and member access, refused to accept cash and certain types of credit card payments, ended a longstanding and popular policy of helping members with outside timeshare exchanges, and reduced owner rentals. Cerberus and Club Exploria also caused CRE Bushkill to cut critical personnel and forbid different departments at the Resort from coordinating operations with one another—in violation of Defendants' contractual obligations. These changes had significant negative effects on the Resort, the timeshare members, and the collections process, and, accordingly, also on the Payment Stream.

15.    In fact, within months, these changes resulted in significant customer complaints and delinquency in payments under the timeshare contracts, to the detriment of the Payment Stream. RGI repeatedly reached out to Defendants to provide recommendations for fixing these problems, but they were consistently ignored.

16.    Then, beginning in March 2018, Cerberus and Club Exploria caused CRE Bushkill to conduct an aggressive campaign of canceling any timeshare contracts that were delinquent in payment instead of following the detailed policies, which Defendants were contractually obliged

to follow, of first exhaustively attempting to collect on those timeshare contracts.  Defendants did so without consideration of the circumstances—such as whether the obligor was, in fact, actually making monthly payments under the contracts or whether the contract could be reinstated or settled, to maximize the Payment Stream, and minimize obligor complaints—as Defendants were explicitly required to do.  In connection with their cancellation campaign, Cerberus and Club Exploria also caused CRE Bushkill to end RGI's successful recovery program whereby, among other things, RGI had worked with members whose contracts had been cancelled in attempt to obtain settlement payments or induce them to rejoin by offering them a less expensive alternative, refinancing, or amenity-based inducements (the "Profit Recovery" program).  These changes violated the terms of the Transaction Agreements and collectively left millions of dollars on the table—money that was supposed to go to RGI as part of the Payment Stream.

17.     As RGI would later find out, Cerberus and Club Exploria were causing CRE Bushkill to cancel these contracts to create inventory for Club Exploria to sell timeshares in its own Club Exploria membership program, which would include access to Club Exploria's other properties (the "Membership Program").  Importantly, Cerberus and Club Exploria would not have to share the profits from the Membership Program with RGI.  Further, even if it was unable to sell the recaptured inventory, Club Exploria was able to borrow against the unused inventory to obtain much-needed cash for its own and Cerberus's benefit.  While the cancellations directly benefited Club Exploria and Cerberus, they had an immediate and negative impact on the Payment Stream. Defendants' cancellations were also detrimental to the CRE Subsidiaries, further demonstrating how Cerberus entirely ignored the CRE Subsidiaries' corporate separateness.

18.     By May 2018, the payments to RGI under the Payment Stream had fallen below projections by approximately $59,000—an amount that would grow exponentially over the life of

7

the Participation Portfolio.  RGI provided Defendants with notice of this delinquency as well as directives for how to remedy it, but, in direct violation of Defendants' contractual obligations, Defendants ignored RGI's directives.  Not surprisingly, through Defendants' continued refusal to act on RGI's directives and breach of their contractual obligations, this revenue shortfall has continued to balloon, now amounting to over $4,000,000, which will only continue to grow.

19.     Defendants' continued to ignore RGI until in December of 2018, when Cerberus and Club Exploria needed immediate liquidity.  In connection with the parties' Transactions Agreements, only RGI could borrow on the hypothecation loan secured by the Participation Portfolio, but if RGI did, it would be required to split the amount 50/50 with Cerberus's subsidiary and alter ego, CRE Niagara PH.  Defendants wanted RGI to borrow $3 million, so that CRE Niagara PH could take its $1.5 million and transfer it, without consideration, to Club Exploria.

20.     As a result Defendants made false promises to RGI to agree to the borrowing that it would return to running the Resort as promised and curing its breaches, if RGI entered into a supplemental agreement to borrow the funds.  In reasonable reliance on those promises, RGI abstained from bringing suit or otherwise enforcing its rights under the Transaction Agreements and in December 2018 entered into an agreement to borrow the funds Defendants had requested (the "Supplemental Agreement") and did in fact borrow the funds.

21.     Despite Defendants' assurances, however, throughout the first half of 2019, they continued to cut corners, reduce customer service, and abandon even more of their obligations under the Transaction Agreements to run the Resort, at a minimum, at the same standards as applied by RGI.  During this time, the CRE Subsidiaries also continued to ignore RGI's directives, in breach of the Transaction and Supplemental Agreement.  This caused increasing delinquencies on the timeshare contracts, and with it, an ever-increasing shortfall from the parties' projections.

22.     Further, in direct abrogation of the promises Defendants had made, Defendants failed to re-implement the successful Profit Recovery program, restore amenity hours and member access, resume helping members with outside timeshare exchanges, restore the link between Collections and Reservations, or re-authorize different departments at the Resort to work with one-another to maximize member satisfaction and thereby restore the Payment Stream.  In fact, as Defendants knew, but concealed, at the time, they could never have re-implemented the Profit Recovery program, because Defendants had taken all of the available inventory of available timeshare contracts at the Resort, and re-registered it for use in Club Exploria's own Membership Program.  Thus, members whose contracts had been cancelled could no longer be induced to rejoin, because the type of memberships they had no longer existed.

23.     In July 2019, Cerberus and its alter ego Club Exploria approached RGI and again pressured RGI to borrow even more on the existing hypothecation loan, this time for $6.0 million to be split evenly with CRE Niagara PH (which would then, once again, immediately transfer, without consideration, the funds to Club Exploria).  In its discussions with RGI, Cerberus and Club Exploria made numerous false and material misrepresentations of fact to RGI in an attempt to coerce it into entering into an additional supplemental agreement, including, once again, that they would reintroduce RGI's successful Profit Recovery program, restore Resort amenity hours and member access, resume helping members with outside timeshare exchanges, restore the link between the collections and reservations departments, and reauthorize different departments at the Resort to work with one another to maximize member satisfaction.  Justifiably relying on those misrepresentations, and seeking to alter the Resort's continued downward trajectory, RGI again abstained from bringing suit or otherwise enforcing its rights under the agreements, and agreed to further borrow on the loan and enter into the second supplemental agreement (the "Second

Supplemental Agreement" and, together with the Supplemental Agreement, the "Financing Agreements").

24.     Following the execution of this Second Supplemental Agreement and borrowing, Cerberus and Club Exploria again failed to enact any of the promised material changes in their management or collections processes, as was their plan from the outset.

25.     Left with no other option, in November 2019, RGI issued formal default notices to Defendants under their various contractual agreements.  As had become unfortunately typical of Defendants in their dealings with RGI, Defendants responded by denying any wrongdoing and refusing to change their course of conduct.  Seeing no material changes in operations, and noting the continued and increasing downward trend in collections under the timeshare contracts, RGI sent additional default notices in December 2019 and January 2020.

26.     RGI received no response from Defendants in that time.  Indeed, Defendants appear to have cut off all communication with RGI concerning the operation of the Resorts, further repudiating their obligations under the Agreements.[1]

27.     Moreover, RGI has learned that in March 2020 Defendants shut down their collections and financial services operations at the Resort, firing all of the Collections and Financial Services employees—both amounting to further material breaches of the Agreements. The result has been devastating on the Participation Portfolio.  Timeshare members have been unable to obtain reservations and collections on the Participation Portfolio have plummeted further.  Further, Defendants have started to entirely ignore the directives from RGI concerning collection procedures—directives that Defendants are contractually obligated to follow.

---

[1]     "Agreements" is defined herein to include the Transaction Agreements, the Financing Agreements, and the PSQ Agreement.

28.     As a result of Defendants' conduct, the value of the Payment Stream has largely been destroyed.

29.     RGI sent a final default notice on March 30, 2020, detailing the various defaults and other contractual breaches that were occurring, to which RGI never received a substantive response.  RGI had no choice but to institute this action as a result of Defendants' numerous and material contractual breaches, which have resulted in their wholesale destruction of the Participation Portfolio, and Cerberus and Club Exploria's tortious interference with the UAPA.

## PARTIES

30.     Plaintiff Resorts Group, Inc. is Pennsylvania corporation with its principal place of business in Pennsylvania.

31.     Defendant Cerberus Capital Management, L.P. is a Delaware limited partnership with its principal place of business at 875 Third Avenue, New York, New York.

32.     Defendant CRE Niagara Holdings LLC is Delaware limited liability company with its principal place of business at 875 Third Avenue, New York, New York.  CRE Niagara is a wholly-owned subsidiary and alter ego of Cerberus and Club Exploria that was formed solely for the purpose of effectuating the sale of Transaction Agreements (defined below).  Indeed, CRE Niagara's foreign registration filed with the Pennsylvania Department of State, dated May 17, 2017, was executed by Joseph Sciacca—Cerberus's General Counsel and Managing Director. Upon information and belief, CRE Niagara (i) is financially dependent on Cerberus and would not exist but for its relationship with Cerberus; (ii) has its executive leadership selected by Cerberus and comprised of Cerberus's employees, or employees of other Cerberus subsidiaries; (iii) has no day-to-day business operations and instead acts merely as a holding company for Cerberus's benefit; (iv) fails to deal with Defendants  at arms' length; and (v) intermingles its property with that of Defendants.  Through the Servicing Agreement (defined below), Cerberus has expressly

acknowledged that CRE Niagara Holdings LLC—the "Purchaser"—is "Controlled, directly or indirectly, by Cerberus Capital Management, LP."

33.     Defendant Club Exploria, LLC is a Delaware limited liability company with its principal place of business at 875 Third Avenue, New York, New York.  Club Exploria is a wholly-owned subsidiary and alter ego of Cerberus.  Upon information and belief, Club Exploria (i) is financially dependent on Cerberus and would not exist but for its relationship with Cerberus; (ii) has its executive leadership selected by Cerberus; (iii) has its operations managed by Cerberus; (iv) fails to deal with Defendants at arms' length; (v) intermingles its property with that of Defendants; and (vi) maintains a common address with Cerberus.  Through the Servicing Agreement (defined below), Cerberus has expressly acknowledged that Cerberus' "wholly-owned subsidiaries" and "other Affiliates"—such as Club Exploria—"are Controlled, directly or indirectly, by Cerberus Capital Management, LP."

## JURISDICTION AND VENUE

34.     This Court has diversity jurisdiction over this action under 28 U.S.C. § 1332 because this is a civil action between citizens of different states, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

35.     This Court has personal jurisdiction over Defendants because they all were incorporated in the State of Delaware.  Further, Defendants have consented to exclusive jurisdiction in this Court unless it is "unavailable."

36.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(1) because Defendants reside in this District, and all Defendants are subject to personal jurisdiction in Delaware for purposes of this action.

## FACTUAL BACKGROUND

**I.     RGI Operates The Resort And Related Timeshare Properties
Through Subsidiary Bushkill Group.**

37.     RGI is a successful developer and operator of timeshare and other vacation properties in Pennsylvania.  In 2006, RGI acquired Bushkill Group, Inc. ("Bushkill Group"), which owned and operated the Resort, consisting of 400-acres of vacation properties in the Pocono Mountain region of Pennsylvania with approximately 650 timeshare units ranging from one to four bedrooms and a membership of approximately 19,000 families.  The Resort primarily consists of the Villas at Tree Tops and Fairway Villas.

38.     Upon acquiring Bushkill Group, RGI took over the day-to-day operation of the Resort.  Between 2006 and 2017, through RGI's stewardship, Bushkill Group enjoyed consistent success, profitability, and growth, making it one of the leading single site timeshare resort properties in the Mid-Atlantic region.

39.     RGI obtained a track-record of success at the Resort, through its proven strategies of resort management.  *First*, RGI focused on customer satisfaction and fulfillment.  Among other things, RGI ensured customers could promptly make reservations, assisted members with outside timeshare exchanges, provided members with "Day Access" to the Resort outside of their set vacation time, and provided the members with significant access to the Resort's amenities.  By focusing on customer service, RGI ensured that its existing customer base would continue vacationing at the Resort for years to come while fulfilling their obligations to make timely payments.

40.     *Second*, RGI integrated its Servicing and Collections functions into its overall resort operations by having RGI's Servicing and Collections personnel work closely with all of the Resort's departments, including reservations, sales, marketing, legal, housekeeping, check-in,

customer service, and amenities.  This holistic approach allowed RGI to ensure that customers were properly attended to, as well as appropriately motivated and incentivized to fulfill their payment obligations.

41.     *Third*, RGI would not cancel delinquent or non-performing contracts until after it had exhausted all possible avenues to return the member to paying status.

42.     *Fourth*, RGI engaged in an aggressive "Profit Recovery" program.  Through this program, RGI contacted members whose contracts had been cancelled six or more months after cancellations in an attempt to induce them to settle or reinstate the contract, including by offering them to refinance, to switch to a lower-cost plan, or amenity-based inducements.

43.     As a result of RGI's policies and procedures, the Resort attracted and retained timeshare members who had a history of paying on a timely basis and had high levels of customer satisfaction.  RGI's policies and procedures also enabled it to successfully collect at high rates from members whose payments had become delinquent, without canceling them.

## II.     RGI Sells Bushkill Group's Assets And Equity To Cerberus.

44.     In 2017, RGI sought to capitalize on its track record of success and sell Bushkill Group to an industry leader who could continue to grow the Resort and manage the business at the level that RGI had for the prior 11 years, including for the benefit of RGI's existing timeshare members.  RGI determined that Cerberus—a $42 billion hedge fund headquartered in New York, with a successful track record in the timeshare business—would be a fitting partner.  Indeed, RGI was aware that Cerberus had previously acquired and then successfully grown and sold Silverleaf Resorts, Inc. ("Silverleaf") to the Holiday Inn Vacation Club.

45.     In negotiations with RGI, J. Richard Budd—a principal of Cerberus—made clear that Cerberus was working on expanding its presence in the timeshare industry through this transaction, as well as another unnamed transaction that was already in the works.  Upon

information and belief, the unnamed transaction was Cerberus's planned acquisition of Club Exploria and its principal resort, Summer Bay in Clermont, Florida, a larger timeshare company that was then under significant financial distress.

46.    In these discussions with RGI, Budd, on behalf of Cerberus, repeatedly represented, in front of key RGI personnel, that Cerberus intended for Bushkill Group to act as the "Corporate Headquarters" for its future timeshare holdings, with RGI's employees to remain employed at the large offices and data center in Bushkill, Pennsylvania.  The retention of key employees with established expertise and institutional knowledge was important to RGI, which wanted to ensure that, following the closing of the transaction, its employees would remain gainfully employed, and capable of following the policies, procedures and practices that had made the Resort so successful under RGI, and which would ensure a successful Payment Stream.  Budd and Scott Robertson— Cerberus's Portfolio Chief Operating Officer/Manager—specifically informed RGI on many occasions, including but not limited to meetings in Bushkill, Pennsylvania in July, August, and October 2016 that any additional timeshare acquisition by Cerberus would not lead to a replacement or degradation of the key personnel with established expertise and institutional knowledge.  These assurances that Bushkill Group would be the "Corporate Headquarters" and that RGI's key employees would remain employed were repeated at a meeting called by Cerberus at the offices of its counsel, Schulte, Roth, and Zabel, in September 2016, which was attended by Budd and Robertson for Cerberus, and Matthew Greenberg, Steven Schauder, and Michael Gilligan for Schulte, Roth, and Zabel.  In a February 2017 meeting with RGI principals at Cerberus's headquarters in New York, Budd reconfirmed Cerberus's intention to build on the "Bushkill platform," and said that additional timeshare acquisitions would not lead to a replacement or degradation of the key RGI personnel.

15

47.     Upon information and belief, Cerberus, knew that these statements were false at the time that it made them.  Unbeknownst to RGI, Cerberus intended to use the larger, but financially distressed, Club Exploria as its true "Corporate Headquarters," and use the Resort's assets for the benefit of Club Exploria—and not the other way around.  Again, had RGI known this to be true, it never would have entered into the transaction, particularly given Club Exploria's physical distance from the Resort and Club Exploria's poor track record in timeshare management as evidenced by, among other things, its financial distress.

48.     By early 2017, after many months of meetings, due diligence, and negotiations between Cerberus and RGI, it became apparent that the parties were generally in agreement about the purchase price for Bushkill Group's equity and its assets, with a single exception—the Payment Stream arising from the Participation Portfolio.  At that time, the Payment Stream consisted of the expected future payments from Bushkill Group's Participation Portfolio, including the existing contracts for the timeshares in the Villas at Tree Tops (the "Timeshare Contracts") and the Fairway Villas (the "Fairway Contracts for Deed").  Collectively, this portfolio of existing contracts, as of May 2017, was comprised of 6,950 performing timeshare contracts with a total principal value of $66.1 million, as well as approximately 800 delinquent timeshare contracts with a total principal value of $8.6 million.  The Payment Stream and the underlying Participation Portfolio were pledged to Western Alliance Bank to secure RGI's $38 million hypothecation loan (the "Hypothecation Loan").  RGI, as the longtime steward of the Resort and the underlying business, knew based on its track record that the Participation Portfolio, including the delinquent contracts, held significant value if they were properly worked and the Resort was properly managed.

49.     Due to the significant value of the Participation Portfolio, RGI negotiated with Cerberus the terms of the sale of the equity in Bushkill Group separately from the Participation

16

Portfolio.  Cerberus—through its alter egos, the newly-formed CRE Subsidiaries—would acquire the equity in Bushkill Group, and along with it, the Resort, the Participation Portfolio, various appurtenant land, unsold timeshare inventory, and other resort-related assets, while RGI would retain ownership over the Payment Stream from the Participation Portfolio.  ██████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

███████████████████████████████████████████████ Further, while RGI would receive the cash flow generated by the Participation Portfolio, Cerberus, through the CRE Subsidiaries, would own the actual underlying contracts, memberships, and obligations, and also be able to enter into new contracts outside of the Participation Portfolio and Payment Stream.

50.    In retaining ownership of the Payment Stream, but selling, with few exceptions, all other Bushkill Group assets to Cerberus, RGI would be taking a risk, because it would be depending on Cerberus to properly manage the Resort and work the Participation Portfolio.  As such, the parties created a revenue-sharing structure that would align the parties' interests in the Participation Portfolio and the Payment Stream.  *First*, Cerberus would purchase the right to participate in the Payment Stream (the "Participation Interest").  *Second*, Cerberus's share of the Payment Stream would be deferred until after RGI had fully repaid the Hypothecation Loan, thus incentivizing Cerberus to properly work the Participation Portfolio to ensure a quick repayment of the Hypothecation Loan.  Under this arrangement, neither party would receive distributions from the Payment Stream until the Hypothecation Loan was repaid in full.  *Third*, RGI and Cerberus agreed to a set of projections concerning the expected revenue generated by the Participation Portfolio (the "Schedule 2 Benchmarks").  Any failure by Cerberus to hit the Schedule 2 Benchmarks (a "Schedule 2 Shortfall") would reduce Cerberus' share of the Payment Stream upon

the payoff of the Hypothecation Loan.  *Fourth*, RGI would hold all cash flow coming from the Payment Stream, thus requiring Cerberus to perform if it wanted to receive its share.

51.     The Schedule 2 Benchmarks were carefully negotiated by the parties and were reasonable and, in fact, conservative based on RGI's track record.  Prior to closing, Cerberus—a highly sophisticated private equity fund, itself having a proven track record in the timeshare industry and completing financially complex acquisitions—conducted detailed due diligence on RGI's operations, the Participation Portfolio, and the Schedule 2 Benchmarks.

52.     In May 2016—one full year prior to the transaction date—Cerberus engaged Crowe Horwath LLP ("Crowe Horwath"), a global audit and accounting firm, to conduct a quality of earnings review of Bushkill Group.  During its months-long review, which was conducted both remotely and at an in-person visit, Crowe Horwath was provided with complete access to all aspects of Bushkill Group's financials, including the Participation Portfolio, and encompassed, among other things, Bushkill Group's sales data, methods for calculating bad debt, and financial services' collections cash reporting.  Crowe Horwath's review was probing and thorough.

53.     Cerberus also engaged Quanta Financial, LLC ("Quanta"), an outside expert in timeshare finance, collections, and securitizations.  In April 2017, Quanta performed an in-depth analysis of the receivables in the Participation Portfolio on-site in Bushkill, Pennsylvania.  Quanta sampled contracts, and examined agings, payment histories, trial balances, and servicing records.  It also interviewed key Bushkill Group employees in order to underwrite RGI's servicing and collections policies and procedures.

54.     Finally, Western Alliance Bank, the lender on the Hypothecation Loan—which had significant experience with timeshare financing, as well as an economic interest in the Participation

18

Portfolio—similarly reviewed the Schedule 2 Benchmarks and approved a hypothecation loan to RGI secured by the Payment Stream.

### III.     In Connection With Closing, RGI Enters Into The Transaction Agreements With The CRE Subsidiaries.

55.     For purposes of effectuating the sale, Bushkill Group was renamed CRE Bushkill Group, LLC.  Cerberus also created, for the purpose of effectuating the sale, new alter ego holding companies, CRE Niagara and CRE Niagara PH.

56.     In connection with the closing, RGI and Cerberus—through its subsidiaries CRE Bushkill and CRE Niagara—entered into three Transaction Agreements to reflect the terms of this arrangement and to provide certain protections to RGI's interest in the Payment Stream.  *First*, RGI entered into a servicing agreement with CRE Bushkill (the "Servicing Agreement").  A true and correct copy of the Servicing Agreement is attached hereto as **Exhibit A**.  *Second*, RGI entered into a participation agreement governing the Participation Interest with, and in favor of, CRE Bushkill, dated May 18, 2017 (the "Participation Agreement").  A true and correct copy of the Participation Agreement is attached hereto as **Exhibit B**.  *Third*, RGI entered into the UAPA with CRE Niagara, dated May 19, 2017.  A true and correct copy of the UAPA is attached hereto as **Exhibit C**.  Through the UAPA, which incorporated the obligations of the Servicing Agreement and the Participation Agreement, CRE Bushkill was transferred to Cerberus's ownership, through its wholly-owned subsidiary CRE Niagara.

57.     The deal was structured this way so that (i) CRE Niagara would acquire and own the equity of Bushkill Group under the UAPA, (ii) CRE Bushkill (newly renamed from Bushkill Group) would manage the Resort and related operations through the Servicing Agreement, and (iii) CRE Bushkill would have a right to a portion of the Payment Stream under the Participation Agreement.  Upon information and belief, Cerberus also structured the transactions through

subsidiaries in an attempt to shield itself from obligations thereunder, despite their domination and control of CRE Bushkill and CRE Niagara.

58.     The agreements were negotiated entirely by Cerberus—not its subsidiaries, which through the course of negotiations did not even exist—thereby evidencing Cerberus's intent to be bound by the parties' agreements.  Cerberus's subsidiaries acted only as dummy corporations used for Cerberus's purposes in executing these three Transaction Agreements.

59.     To maintain practical control over CRE Bushkill, at the time of the closing, Cerberus named J. Richard Budd—a principal of Cerberus—as the President and CEO of CRE Bushkill.  In this position, Budd would manage and control CRE Bushkill's day-to-day operations on behalf of Cerberus, while continuing to actively hold his position at Cerberus.  To exert further domination and control over the CRE Subsidiaries' operations, Cerberus also named Scott Robertson—an officer of Cerberus—as the Chief Financial Officer of the CRE Subsidiaries and Joseph Sciacca—Cerberus's General Counsel and a Managing Director—as an additional officer.

### A.     *The Servicing Agreement*

60.     Through the Servicing Agreement, RGI contracted for Cerberus—acting through its alter ego and wholly-owned subsidiary, CRE Bushkill—to act as the "Servicer" that managed all functions at the Resort that could affect the Payment Stream.  Among the functions that were transferred to CRE Bushkill were data processing, automated contract servicing, payment, processing, billing, collections, financial services and recovery, reservations, customer service, as well as various other functions.  CRE Bushkill also explicitly agreed to continue RGI's approach of maintaining positive customer satisfaction to ensure that customers would be incentivized to continue making payments on the Participation Portfolio.  In exchange for these obligations, among other consideration, RGI agreed to pay servicing fees to CRE Bushkill on a monthly basis.

61.     As part of the Servicing Agreement, RGI surrendered any right to effectuate collection on the Participation Portfolio itself.  (Servicing Agreement, § 2.2(a).)  Therefore, to protect its interest in the Participation Portfolio, RGI negotiated for numerous provisions to ensure CRE Bushkill managed the Resort according to the consistent standards that RGI had previously established and protect RGI's interest in the Payment Stream.   These protective provisions imposed specific standards of operation on CRE Bushkill (including the obligation to maintain the Resort's residential and vacation ownership services obligations, at a minimum, at the same standards as under RGI), imposed reporting and transparency requirements for RGI's benefits, and provided for certain non-exclusive remedies in the event of default, including requiring CRE Bushkill to follow RGI's directives, and even allowing for the removal of CRE Bushkill as the Servicer if it materially defaulted on its obligations and failed to cure such default.

62.     Pursuant to Section 3.2(a), CRE Bushkill agreed to follow detailed servicing, collection and enforcement policies and procedures previously established by RGI, which were attached to Schedule 1 of the Servicing Agreement and incorporated therein:

> The Servicer shall take or cause to be taken all such actions as is reasonably necessary and/or advisable to manage, administer, service and collect the Timeshare Contract Payments in order to maximize the receipt of payments therefrom, in each case, in accordance with the Servicing, Collection and Enforcement Policies and Procedures, attached hereto as Schedule 1.

(Servicing Agreement, § 3.2(a).)

63.     Further, under Section 3.2(d), CRE Bushkill agreed to service the Participation Portfolio at a level commensurate to that which RGI had previously provided, and agreed to refrain from prioritizing its own set of receivables:

> In discharging its duties under this Article 3, the Servicer shall appropriately, fairly and in good faith allocate its resources and personnel so that the Timeshare Contracts and Fairway Contracts for Deed are accorded appropriate attention and servicing diligence (consistent with past practices of RGI's Affiliates and sufficient

to allow Servicer to meet its Servicing, Collection and Enforcement Standards including, without limitation, allocating to personnel working on Timeshare Contracts and Fairway Contracts for Deed appropriate personnel incentives, compensation, workloads and training) and are not intentionally disadvantaged for the direct or indirect benefit of Servicer's portfolio of Timeshare Contracts, Fairway Contracts for Deed or similar such timeshare receivables, in each case, originated after the Closing Date.

(*Id.*, § 3.2(d).)

64.     Section 3.2(e) similarly precluded CRE Bushkill from abandoning its servicing and

collections obligations under the Servicing Agreement without RGI's prior written consent:

[T]he Servicing, Collection and Enforcement Policies and Procedures set forth on Schedule 1 attached hereto and having application to the Timeshare Contracts and Fairway Contracts for Deed, as provided in this Section 3.2, may not be amended or modified without the prior written consent of RGI.

(*Id.*, § 3.2(e).)

65.     Under Article 3.11, CRE Bushkill also undertook certain reporting obligations that

were intended to ensure that RGI could monitor its performance in servicing the Payment Stream.

In relevant part, this provision provided:

During the Servicing Term, the Servicer will furnish to RGI . . . unless RGI shall otherwise consent in writing: (a) each of the reports specified in Schedule 4 attached hereto by the dates specified in such schedule; . . . [and] (c) promptly, but in no event later than five (5) Business Days after the earlier of a Responsible Officer having actual notice of, or receiving written notice from RGI of, the occurrence of any Servicer/Resort Default or Potential Servicer/Resort Default, the state of a Responsible Officer setting forth the details of such Servicer/Resort Default or Potential Servicer/Resort Default and the action which the Servicer proposes to take with respect thereto[.]

(*Id.*, § 3.11(a), (c).)

66.     To provide RGI with increased transparency into CRE Bushkill's operations,

Section 3.15 required Servicer to permit RGI the right to conduct, at CRE Bushkill's expense, an

inspection of its records, files, books of account, databases, and other information.

67.     Section 3.12 required CRE Bushkill to provide, on an annual basis, to RGI a certification that during the preceding year CRE Bushkill "has performed and observed all of its obligations under this Agreement in all material respects" and that either no defaults had occurred or that any default had been cured (the "Annual Officer's Certificate").

68.     The Servicing Agreement provided that a "Servicer/Resort Default" exists if, among other things:

> (a)(i)   CRE Bushkill failed to comply with any material obligation under the Servicing Agreement (except for certain separately defined defaults discussed elsewhere) after notice and an opportunity to cure;
>
> (a)(ii) there was a "Cash Flow Shortfall Default," defined as where payments received in the Payment Stream for three consecutive calendar months, or any four non-consecutive months in a twelve-month period, are below the Schedule 2 Benchmarks; or
>
> (e) There was "any event or occurrence that (i) has caused, or would reasonably be expected to cause, a Servicer Material Adverse Effect," defined to include "with respect to any event or circumstance, a material adverse effect on (a) the business, property, licensing, operations, financial condition, prospects, liabilities or capitalization of Servicer or (b) the ability of Servicer to perform its obligations under this Agreement, in each case, which event or circumstance occurred after the date of the Purchase Agreement."

(*Id.*, § 1.1.)

69.     Further, "Material Servicer/Resort Default" is "any Servicer/Resort Default, which has a material adverse effect on the likelihood of payment and/or collectability of the remaining unpaid Timeshare Contract Payments, including but not limited to a Cash Flow Shortfall Default."

70.     The Servicing Agreement also provided for a number of non-exclusive remedies in the event of CRE Bushkill's default, including a requirement that CRE Bushkill comply with all of RGI's directives in the event that a Servicer/Resort Default other than a Cash Flow Shortfall Default existed:

> Anything contained herein to the contrary notwithstanding and in addition to any other rights and remedies of RGI, during any period when a Servicer/Resort Default other than or in addition to a Cash Flow Shortfall Default shall exist, the Servicer shall take any reasonable action that it is directed, in writing, to take by RGI which relates to the Servicer's obligations under this Agreement . . . .

(*Id.*, § 3.2(f).)

71.    Nevertheless, given that the Transaction Agreements contemplated a continuing relationship among the parties, the parties agreed that, among other things, they need not immediately enforce any breaches and that any waiver of one term would not constitute a subsequent waiver:

> Any waiver of any term or condition of this Agreement shall not be construed as a waiver of any subsequent breach, or a subsequent waiver of the same term or condition or a waiver of any other term or condition, of this Agreement. The failure of any Party to assert any of its rights hereunder shall not constitute a waiver of any of such rights. No failure or delay by any Party in exercising any right, power or privilege under this Agreement shall operate as a waiver thereof nor shall any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any other right, power or privilege.

(*Id.*, § 6.2(b).)

72.    The parties also agreed that "[t]he rights and remedies provided in this Agreement shall be cumulative and not exclusive of any rights or remedies provided by Applicable Law." (*Id.*)

73.    The Servicing Agreement provided that copies of all notices to CRE Bushkill under the agreement were required to be sent to Cerberus's counsel—Boris Ziser of Schulte Roth & Zabel LLP—in New York, New York.  (*Id.*, § 6.1.)

74.    The Servicing Agreement as acknowledged that (a) Cerberus' "wholly-owned subsidiaries" and "other Affiliates, including, without limitation, [CRE Niagara]" are "Controlled, directly or indirectly, by Cerberus Capital Management, LP," and (b) Cerberus "beneficially own[s] and control[s]" CRE Bushkill.

75.     Finally, the Servicing Agreement provided that it would be governed by the laws of New York, without regard to choice-of-law principles, which would also be the exclusive jurisdiction for disputes among the parties.  (*Id.*, § 6.5.)

### B.     *The Participation Agreement*

76.     Through the Participation Agreement, RGI created and assigned a "Participation Interest" in the Payment Stream to Cerberus—through its alter ego and wholly-owned subsidiary CRE Bushkill—defined as the "Holder," whereby, following complete repayment of the Hypothecation Loan, CRE Bushkill would receive a portion of the Payment Stream up to a predetermined limit of $15,625,000.  (Participation Agreement, §§ 1.1, 2.1, 4.1.)

77.     As Holder, under Section 2.8, CRE Bushkill expressly acknowledged that "the Timeshare Contracts and Fairway Contracts for Deed shall be serviced . . . in accordance with the terms and conditions of the Servicing Agreement."

78.     Like the Servicing Agreement, the Participation Agreement required CRE Bushkill to maintain the consistent levels of service at the Resort that had previously been maintained by RGI to ensure that members would continue paying their obligations on the Participation Portfolio, and to ensure that CRE would provide members all of the rights, use and enjoyment to which they were entitled.  In particular, the Participation Agreement provided that:

> After the Closing Date, the initial Holder agrees to (i) continue to provide, or cause to be provided, to each Obligor (and their guests and families) under the Timeshare Contracts and Fairway Contracts for Deed all of the rights, title, access, services, reservations, use and enjoyment to which they are entitled under their respective Timeshare Contracts and/or Fairway Contracts for Deed . . ., (ii) continue to maintain and operate the Villas in a manner that is at a minimum materially equivalent to how the Villas were being maintained and operated by RGI at the Closing Date, and (iii) . . . provide, or cause to be provided, to the Obligors (and their guests and families) under the Timeshare Contracts and Fairway Contracts for Deed customer service at an overall level of quality that is, at a minimum, materially equal to that provided by RGI prior to closing.

(Participation Agreement, § 5.1.)  Section 5.1 further provided that any transfer of CRE Bushkill's obligations must include the same service standard obligation.

79.     To ensure that Participation Portfolio obligors would have sufficient funds to make payments on the Participation Portfolio, Section 5.2 of the Participation Agreement also limited how much CRE Bushkill could increase maintenance fees—which were not part of the Payment Stream—for the first three years.

80.     RGI negotiated for, and received, protections against the possibility that Defendants would interfere with its ability to receive its portion of the Payment Stream from each timeshare contract.

81.     *First*, if CRE Bushkill or any of its Affiliates—defined to include Cerberus, CRE Niagara, CRE Niagara PH, and Club Exploria—intentionally interfered with the payment obligations of any Participation Portfolio obligor, Section 5.4(b) provided RGI with the right, but not the obligation, to sell back or "put" the obligor's contract to CRE Bushkill in exchange for 100% of the outstanding principal, interest, and fees on the contract.  (*Id.*, § 5.4(b).)

82.     *Second*, in an ultimately unsuccessful attempt to ensure that CRE Bushkill would not simply cancel existing contracts in order to recapture the underlying timeshare interests, Section 5.4(a) provided that for any such cancelled, or non-performing, contracts RGI would have the right, but not the obligation, to receive, at minimum, $350 per interval (timeshare interest) in "non-performance fees" along with any subsequent funds received on any previously cancelled contract, minus reasonable costs of collection.  This was in addition to CRE Bushkill's obligation under Schedule 1 of the Servicing Agreement, discussed further herein, only to cancel contracts after following substantial procedures to ensure that they were no longer "workable" or capable of being collected on.

83.     As with the Servicing Agreement, and given the parties' continuing relationship, the parties agreed that, among other things, they need not immediately enforce any breaches:

> Any waiver of any term or condition of this Agreement shall not be construed as a waiver of any subsequent breach, or a subsequent waiver of the same term or condition or a waiver of any other term or condition, of this Agreement. The failure of any Party to assert any of its rights hereunder shall not constitute a waiver of any of such rights.  No failure or delay by any Party in exercising any right, power or privilege under this Agreement shall operate as a waiver thereof nor shall any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any other right, power or privilege.

(*Id.*, § 8.2(b).)

84.     The parties also agreed that "[t]he rights and remedies provided in this Agreement shall be cumulative and not exclusive of any rights or remedies provided by Applicable Law." (*Id.*)

85.     As with the Servicing Agreement, the Participation Agreement provided that copies of all notices to CRE Bushkill under the agreement were required to be sent to Cerberus's counsel—Boris Ziser of Schulte Roth & Zabel LLP—in New York, New York.  (*Id.*, § 8.1)

86.     Finally, the Participation Agreement also provided that it would be governed by the laws of New York, without regard to choice-of-law principles, the courts of which would have exclusive jurisdiction.  (*Id.*, § 8.5.)

**C.     *The UAPA***

87.     RGI also entered into the UAPA with Cerberus—by and through its alter ego and wholly-owned subsidiary CRE Niagara—whereby RGI sold all of the equity of Bushkill Group (then known as CRE Bushkill) to CRE Niagara, which became the overall developer of the Resort.



91.    RGI negotiated additional protections for itself and its interest in the Payment Stream, as well as the Resort's consumer timeshare customers and Participation Portfolio obligors, to ensure that members would enjoy all of the rights, use and benefits to which they were entitled.





**IV.    Club Exploria Takes Over Management of the Resort And
Quickly Erodes Customer Satisfaction And The Payment Stream.**

97.    Following its acquisition, Cerberus directly controlled CRE Bushkill and CRE
Niagara, which acted as Cerberus's alter egos.  For example, at that time, Dennis Rogers—the
Director of Financial Services and the Collections Manager for CRE Bushkill—reported directly
to J. Richard Budd of Cerberus.  Budd similarly acted as the interface between CRE Bushkill and
CRE Niagara on the one hand, and RGI on the other.

98.    To the best of RGI's knowledge, for the first six months following the Closing,
Cerberus—through its alter egos and wholly-owned subsidiaries CRE Bushkill and CRE
Niagara—appeared to materially abide by their obligations under the Transaction Agreements.  By
following these procedures, CRE Bushkill hit all of the Schedule 2 Benchmarks that the parties
had put in place.

99.    That track record of success, however, began to fall apart in November 2017 when
Cerberus completed its acquisition of Club Exploria.

100.    On November 2, 2017, Cerberus publicly announced that it had acquired Club
Exploria, a Florida-based timeshare vacation club.  At that time, the bulk of Club Exploria's
holdings, and focus, was in the Florida timeshare market, at Summer Bay resort in Clermont,
Florida.  Upon information and belief, at the time, Club Exploria was under significant financial
distress, and despite significant holdings, had not managed to become profitable.  Further, upon
information and belief Club Exploria was in need of cash to turn around its failing operations.

101.    In connection with this acquisition, Cerberus publicly announced that the Resort
would "operate as part of" Club Exploria.  This announcement made clear that the Resort's large
offices and data center in Bushkill, Pennsylvania would not—contrary to Cerberus's direct and
unequivocal representations—be acting as the "Corporate Headquarters" of Cerberus's timeshare

30

holdings. Instead the "Corporate Headquarters" for Cerberus's timeshare holdings would be Club Exploria's offices in Florida.

102.    Cerberus planned to use Club Exploria as its alter ego for managing all of Cerberus's timeshare holdings, including the Resort. Cerberus and Club Exploria, in turn, would operate those timeshare holdings as if those holdings were their own—regardless of what Cerberus entity technically held title.

103.    Upon information and belief, Cerberus's regularly conducts business by dominating and controlling the operations of its portfolio companies, which it integrates into a unified platform without regard to corporate separateness. Cerberus's website refers to its private equity investment segment as "operational private equity," and describes Cerberus as an "operationally-oriented investor" whose "operating and investment teams" are "continuous[ly] engaged" in the operations of its portfolio companies. Further, a profile of Cerberus that it touts on its website describes how "[o]nce Cerberus has control of an asset . . ., the firm rolls up its sleeves and begins the task of managing it." Cerberus's website also advertises its disregard of corporate separateness, stating that Cerberus "operates its global investment platforms in an integrated manner, whereby each platform contributes to and draws from the experience and resources of the other businesses."

104.    Accordingly, Cerberus installed J. Richard Budd as the Executive Chairman of Club Exploria, and installed Tom Morris as President and CEO, an executive with loyalties to Cerberus over whom Cerberus could maintain direct control. Upon information and belief, Mr. Morris had arranged for Cerberus's prior acquisition of Silverleaf in 2011, when he was Vice President Capital Markets and Strategic Planning of Silverleaf, and in return, upon its acquisition, Cerberus installed him as CEO of Silverleaf, a position which he held until shortly after Cerberus

sold Silverleaf.  Upon information and belief, Mr. Morris has also served as a consultant for Cerberus, and Cerberus has direct control over his continued employment and amount of compensation.

105.    Further, an announcement to Resort employees signed by Cerberus's J. Richard Budd made clear that Cerberus planned to ignore any corporate separateness between itself, Club Exploria, and the CRE Subsidiaries.  The announcement stressed that the Resort was to be "integrated" into the Club Exploria brand, that "all organization systems [would be] fully integrated," and that Club Exploria and CRE Bushkill should operate as "ONE TEAM."

106.    Upon Club Exploria taking over operations at the Resort, Cerberus and Club Exploria caused CRE Bushkill to make immediate—and harmful—changes to the Resort's operations, including, without limitation:

   a.   Significantly reducing resort amenity hours;

   b.   Demolishing 50 off-line timeshare units, some of which housed amenities that were not replaced;

   c.   Eliminating essential positions and key personnel with institutional knowledge and expertise;

   d.   Reducing owner rentals;

   e.   Forbidding members from paying with cash—or certain credit cards—at the Resort; and

   f.   Stopping the Reservations department from engaging in the long-standing practice of helping members with outside timeshare exchanges.

107.    These changes were in breach of multiple provisions of the Transaction Agreements, including, but not limited to, Section 6.11 of the UAPA, which required Defendants

to:   (1) provide members with "all of the rights, title, access, services, reservations, use and enjoyment to which they are entitled thereunder"; (2) "continue to maintain and operate [the Resort] in a manner that is at a minimum materially equivalent to how such [they] were being maintained and operated by [RGI] as of the Closing Date"; and (3) "provide, or cause to be provided, to the [members] (and their guests and families) under their respective Timeshare Documents customer service at an overall level of quality that is, at a minimum, materially equal to that provided by [RGI] prior to the Closing."

108.   These changes had an aggregate effect that negatively impacted member satisfaction and collections, and with them, the Payment Stream.  Indeed, a representative from CRE Bushkill specifically informed RGI, in or around February 2018, that these failures were directly affecting the collections.

109.   Cerberus, through Club Exploria, then began making significant changes to long-standing policies and programs that are specifically detailed in the Servicing Agreement's "Servicing, Collection and Enforcement Policies and Procedures," which CRE Bushkill was obligated to follow as written pursuant to Section 3.2(a) of the Servicing Agreement.

110.   *First*, Cerberus and Club Exploria willfully caused CRE Bushkill to prohibit personnel in Financial Services and Collections departments from working directly with the "Reservations" department, which, as explained further herein, Club Exploria subsequently shut down altogether and moved to Florida.  RGI had explicitly required these departments to work together, among other things, to ensure that paying members did not become delinquent because they could not obtain a reservation, and to allow delinquent members who were making partial payments or had a temporary extenuating circumstances, to obtain reservations, even on an

expedited or complementary basis, if they made good on their obligations.  (*See* Servicing Agreement, Schedule 1 §§ 6.1, 6.2, 8.1(b), (c).)

111.    *Second*, Cerberus and Club Exploria caused willfully CRE Bushkill to prohibit personnel in Collections, Financial Services, and Servicing departments from working directly with the Sales department.  The Servicing Agreement explicitly required these departments to "cooperate with each other in the interests of customer service, hospitality, accurate record-keeping and ensuring that Bushkill timeshare loan and maintenance fee accounts remain current." (Servicing Agreement, Schedule 1 § 7.1(c).)  This policy quickly resolved consumer complaints at the source, which ensured that customers made their payments on schedule.  Additionally, where Collections, Financial Services and Servicing learned that members were unhappy with their timeshare, they could work with Sales to allow the members to upgrade to a better, and more profitable, contract.

112.    These changes breached the Servicing Agreement and materially impacted the Payment Stream.

113.    The negative impact on member satisfaction brought about by Defendants' changes was evidenced by, among other things, an immediate and significant reduction by Resort members of "upgrades"—which occur when members switch to a more expensive contract that provides them with, for example, a more expensive timeshare unit or additional vacation time.  Following these changes, monthly prepayments based on upgrades—under which, pursuant to the Transaction Agreements, the principal amount owed on upgraded contracts in the Participation Portfolio is paid out at the time of the upgrade—slowed from an average of $490,000 per month prior to Club Exploria taking over, to an average of $280,000 between November 2017 and June 2018.  Such a reduction reflected two significant problems, each of which raised the risk of

delinquency and undermined the parties' ability to hit the Schedule 2 Benchmarks. *First*, the rate of upgrades by customers tends to slow down when there is a rise in the level of customer dissatisfaction. *Second*, the slowing rate of upgrades reflected that Club Exploria was not effectively marketing or selling. Upon information and belief, under Club Exploria, the closing rate for upgrades was considerably lower than the closing rate under RGI.

114. Then, beginning in March 2018, Cerberus and Club Exploria caused CRE Bushkill to suddenly cancel more than $4.5 million worth of delinquent contracts in the Participation Portfolio. Because many of the contracts were still "workable," these blanket cancelations violated the "Timeshare Loan Account Closings and Write-Offs" cancelation" procedure outlined in the "Servicing, Collections and Enforcement Policies and Procedures," which Defendants were required to follow under Section 3.1 of the Servicing Agreement. (Servicing Agreement, Schedule 1 § 9.) That policy forbade CRE Bushkill from canceling any contracts that could "be worked-out, refinanced, settled or compromised," and that policy permitted cancellations only when "the Bushkill membership of the applicable timeshare loan obligor cannot be salvaged," after following specified steps, including ensuring that "every opportunity to collect such account and preserve the Bushkill membership of the applicable timeshare loan obligor . . . has been exhausted." (*Id.*, Schedule 1 § 9.1.) The contracts suddenly canceled by CRE Bushkill at Club Exploria's direction and control, however, included contracts with members who were still actively paying down their delinquency every month, and others where the circumstances (including payment history) indicated that the member had a reasonable likelihood of paying if they were thoroughly worked by the Collections department according to the contractually agreed-upon procedures.

115.    Further, as RGI would later find out, Cerberus and Club Exploria were causing CRE Bushkill to cancel these contracts to create inventory for Club Exploria to sell timeshares in its own Club Exploria Membership Program.  Cerberus and Club Exploria preferred to have inventory for the Club Exploria Membership Program because it would not have to share the profits from the Membership Program with RGI.  Further, even if it was unable to sell the recaptured timeshare inventory, Club Exploria was able to borrow against the unused inventory to obtain much-needed cash for its own and Cerberus's benefit.  The cancellations had an immediate negative impact on the Payment Stream, and this impact grew exponentially each month as future payments were never collected on improperly canceled contracts.

116.    CRE Bushkill's cancellations, at Cerberus and Club Exploria's direction, to create inventory for Club Exploria's Membership Program, thus additionally violated Section 3.2(b) and (d) of the Servicing Agreement, which forbid CRE Bushkill from failing to service the contracts in accordance with RGI's procedures and from prioritizing Defendants' own receivables.

117.    CRE Bushkill—at Cerberus and Club Exploria's direction—continued to aggressively cancel any delinquent contracts to serve Defendants' own self-servicing purpose of building up the Club Exploria membership program, without following the required procedures to ensure that only non-workable contracts were cancelled, in direct violation of Defendants' obligations under the Transaction Agreements.

118.    Defendants' cancellation practices also demonstrate the extent to which Defendants acted as a single, integrated entity dominated by Cerberus without regard to corporate separation: while these cancellations may have directly benefited Cerberus, they harmed the CRE Subsidiaries that owned those contracts and the Participation Interest.

119.     In April 2018, Cerberus and Club Exploria fired Mary Miller, who had developed, and for years had been directly responsible for administering, the "Timeshare Loan Account Closings and Write-Offs" cancelation process.  Firing Ms. Miller therefore made it easier for Cerberus and Club Exploria to abandon these cancellation processes completely in order to continue cancelling contracts and procuring inventory for Club Exploria to sell and to borrow against.

120.     Ms. Miller had also been the senior person overseeing all of the Resort's "Servicing Platform."  The Servicing Platform was the part of the Resort's back-office and data-processing that handled, among other things:  maintaining electronic records of customer receivables, including accruing interest and late fees as well as due dates; producing lender, tax, and bank reporting on those receivables; generating invoices; processing payments, reversals, and adjustments; and supporting the software used by related departments to monetize receivables. The data from the Servicing Platform was critical to reporting on "key indicators"—including metrics on costs, expenses, sales, and customer satisfaction—the core information by which successful resorts monitor current, and project future, performance.  While Defendants could have expanded the in-house Servicing Platform for in-house use at Club Exploria, as explained further herein, Defendants instead ultimately outsourced these functions to the detriment of the CRE Subsidiaries as well as the Payment Stream.

121.     Ms. Miller's absence triggered a continuing degradation of the Servicing Platform and led to additional breaches of Defendants' obligations under Section 3 of the Servicing Agreement, including but not limited to failures in data processing, automated service bureau, payment postings, and merchant processing.

122.    In May 2018, Cerberus and Club Exploria also caused CRE Bushkill to terminate the Profit Recovery program, by which Defendants were obligated to contact former members whose contracts had been cancelled six or more months in an attempt to induce them to settle or reinstate the contract, including by offering them opportunities to refinance, to switch to a lower-cost plan, or amenity-based inducements.  The Profit Recovery program had historically generated significant recoveries for RGI.  Accordingly, the parties' calculation of the Schedule 2 Benchmarks had contemplated significant payments stemming from the Profit Recovery program.  Indeed, several times on or around June 2018, an employee of Club Exploria acknowledged to RGI that it knew that CRE Bushkill was required by the Servicing Agreement to continue the Profit Recovery program.

123.    In May 2018, following continued declines in the performance of the Payment Stream due to Defendants' policy changes, RGI sent its first "Notice of Schedule 2 Shortfall" to Defendants.  At that time, the Payment Stream had fallen below the Schedule 2 Benchmarks—by $59,000.  Of even greater concern to RGI, however, was that, as these multiple violations of the Transaction Agreements—including, but not limited to, Section 5.1 of the Participation Agreement, Section 6.11 of the UAPA, and Section 3 of the Servicing Agreement—continued, more and more Participation Portfolio obligors ceased making their payments and were canceled, it impacted not only the Schedule 2 Shortfall in the initial month of the members' initial delinquency, but in all the following months until maturity.  For example, on a $15,000 RGI timeshare contract financed at 9.9% interest with a 120-month term, the obligor pays $197.40 each month.  The Schedule 2 Shortfall in the first month the Participation Portfolio obligor defaults is just $197.40, but aggregates over 120 months to a $23,688 shortfall.  Additionally, given the increasing number and severity of violations of the Transaction Agreements—in particular,

Section 5.1 of the Participation Agreement and Section 6.11 of the UAPA, RGI began to have concerns that Participation Portfolio obligors might seek Payment Stream refunds because they were not receiving from the Defendants all of the rights, use, benefits, and enjoyment to which they were entitled.  However, instead of bringing suit, RGI instead attempted to work with Defendants to remedy the Schedule 2 Shortfall, as it was permitted to do under the Transaction Agreements without waiving any of its rights to later assert a breach.

124.    In July 2018, CRE Bushkill—at the direction of Cerberus and Club Exploria—conducted mass layoffs at the Resort so that Cerberus could consolidate operations with Club Exploria's Orlando office.  These layoffs hit the "Collections and Financial Services" department—responsible for, among other things, the critical human component of collections—particularly hard, with nearly half of its employees laid off.

125.    Defendants also terminated all but two information technology personnel and one remaining Servicing Platform employee.  As a result, the already short-staffed Collections and Financial Services personnel were required to divert time and attention away from their duties and obligations under the Servicing, Collection and Enforcement Policies and Procedures set forth on Schedule 1, in an attempt to shore up Servicing Platform functions.

126.    CRE Bushkill—at Cerberus and Club Exploria's direction—also terminated its general counsel, who had been in charge of collections referrals for delinquent Participation Portfolio obligors.  Following his termination, no one replaced him to handle this necessary task.

127.    The layoffs and consolidation of operations in Orlando caused an immediate and negative customer reaction due to worsening service.  Members reported being unable to schedule their vacations and obtain reservations.  More directly, Defendants' lay-offs ran directly counter

to their prior assurances, which, upon information and belief, were false when made, that Defendants would maintain RGI's personnel.

128.   Defendants' conduct had a significant, direct, and negative impact on the ability to collect on delinquent accounts, which significantly and negatively affected the Payment Stream. Defendants' corruption of obligor customer service and fulfillment was systemically degrading the Participation Portfolio.

129.   At that same time, Cerberus and Club Exploria caused CRE Bushkill to further curtail amenity access at the Resort, including at the popular Pocono TreeVentures and Pocono Zip Racer "pay-for" amenities.  This violated the Transaction Agreements, including, but not limited to, Section 5.1 of the Participation Agreement and 6.11 of the UAPA, which required Defendants to provide members with the benefit of the use and enjoyment of the Resort.

130.   RGI repeatedly contacted Defendants to try to reverse these changes and remedy these defaults, but Defendants refused to comply with these requests despite their contractual obligation, pursuant to Section 3.2 of the Servicing Agreement, to follow RGI's directives in light of the ongoing defaults and shortfalls.  As a result, more and more Participation Portfolio obligors ceased their making payments, and more and more contracts were canceled.

131.   Defendants' continued defaults and negative changes to the customer experience lead to an increase in the Schedule 2 Shortfall, which by August 2018 had reached $426,000 and was set to grow exponentially over the life of the Participation Portfolio.  Indeed, in or around August 14, 2018, Mr. Budd—the President of CRE Bushkill and a principal of Cerberus—admitted that reinstating the abandoned policies and procedures would likely result in resuming hitting the Schedule 2 Benchmarks.

**V.**     **Cerberus And Club Exploria Induce RGI To Enter Into A Financing Agreement.**

132.    Cerberus and Club Exploria also induced RGI to borrow significant sums on the Hypothecation Loan and pay them to CRE Niagara PH for the benefit of Club Exploria and, as explained further herein, the substantial detriment of RGI.

133.    In November 2018, Cerberus directly contacted RGI to request that RGI borrow $3,000,000 from the Hypothecation Loan, and split the proceeds with CRE Niagara PH for the benefit of Club Exploria. This would effectively pre-pay a portion of Cerberus's Participation Interest, which it was not entitled to receive until after repayment of the Hypothecation Loan, despite Defendants' continuing defaults.  Under the parties' Transaction Agreements, only RGI— which remained the sole borrower and guarantor of the Hypothecation Loan—could borrow on the Hypothecation Loan.  While RGI had no obligation to borrow on the Loan, if it did, RGI would be required, under Section 4.5(b) of the Participation Agreement, to split the proceeds equally with CRE Niagara PH.  These proceeds would then reduce Cerberus's Participation Interest.  Cerberus indicated that while the proceeds were to be paid to CRE Niagara PH, they would be subsequently transferred by CRE Niagara PH—at Cerberus and Club Exploria's direction—to Club Exploria for its benefit.

134.    Cerberus pressured RGI to borrow the money, informing RGI that Club Exploria needed the funds to cover an operating shortfall because it was spending a lot of money "ramping up."  RGI strenuously opposed borrowing additional funds on the Hypothecation Loan, however, because, among other things, such borrowing would:  (1) substantially delay its receipt of funds from the Payment Stream, which only began once the Hypothecation Loan was paid off; (2) delay the time when RGI could reduce Defendants' Participation Interest pursuant to Section 3.6(b) in the Participation Agreement, which provided a mechanism to reduce Defendants' percentage interest in the event of Defendants' default; (3) accrue substantial additional interest expenses; and

(4) delay the release of RGI's shareholders from their personal guarantees on the Hypothecation Loan.

135.    By December 2018, the Schedule 2 Shortfall had increased to $944,000.   In response to this, RGI once again asked Cerberus and Club Exploria—through CRE Bushkill—to reinstate the Profit Recovery program, which RGI estimated, based on its significant prior experience, would significantly reduce the shortfall.  Defendants once again refused, despite their contractual obligations, to comply.   RGI had also alerted Cerberus, in dozens of emails, phone calls, reports, and memoranda, of Defendants' multiple violations of the Transaction Agreements, including, but not limited to, Section 5.1 of the Participation Agreement, Section 6.11 of the UAPA, and Section 3 of the Servicing Agreement.

137.    At that point, Cerberus again began to pressure RGI to borrow $3,000,000 on the Hypothecation Loan, for the benefit of Club Exploria.  To induce RGI to borrow the funds, Cerberus promised RGI that upon receipt of these funds, Defendants would take specific steps to restore member satisfaction and thereby protect the Payment Stream and the Participation Portfolio itself from further deterioration, including to:  (1) reintroduce the successful Profit Recovery program; (2) restore amenity hours and member access; (3) resume helping members with outside

timeshare exchanges; (4) re-create the link between Collections and Reservations; and (5) re-authorize different departments at the Resort to work with one another (or with those departments which had been collapsed into Orlando). These promises were made to RGI in several phone calls and emails from J. Richard Budd on or around December 2, 2018, December 11, 2018, December 13, 2018, and December 17, 2018. They were also made by Dennis F. Rogers, an employee of CRE Bushkill, in numerous phone calls in November and December, 2018, and in person to Mr. Van Sciver on or around November 30, 2018.

138. Although Defendants were already obligated under the Transaction Agreements, these promises were important to RGI because RGI knew that while such actions would mitigate the continuing Schedule 2 Shortfalls, Defendants would not otherwise cure their breaches, so it was the only way that the parties could continue to work together. However, at the time Cerberus made these statements, it had no intention to follow through on its promises, but intended that RGI rely on them. RGI did, in fact, reasonably and justifiably rely on the promise by abstaining from bringing suit against Defendants on their default or otherwise enforcing its rights under the Transaction Agreements, and agreeing to enter into a $3.0 million additional borrowing from Western Alliance Bank under the existing Hypothecation Loan.

139. In connection with this transaction, RGI negotiated with Cerberus the Supplemental Agreement, which was executed by RGI, CRE Bushkill, and CRE Niagara PH and dated December 28, 2018. J. Richard Budd—a principal of Cerberus—executed the Supplemental Agreement on behalf of both CRE Niagara PH and CRE Bushkill. The signature block confirms that he held the position of Chief Executive Officer of each entity. A true and correct copy of the Supplemental Agreement is attached hereto as **Exhibit D**.

140.   Section 1 of the Supplemental Agreement required CRE Bushkill and CRE Niagara PH to maintain collections and customer support in Bushkill, Pennsylvania—rather than being transferred to Orlando—and that it meet RGI's standards.   Additionally, to ensure that the Payment Stream would be properly worked, RGI negotiated for consent rights over any termination of personnel from the Financial Services department.  In particular, Section 2 provided that "CRE [Bushkill] and/or Club Exploria shall obtain RGI's prior written consent before terminating any Financial Services Department personnel." ▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

141.   Upon information and belief, upon the execution of the Supplemental Agreement and RGI's transfer of half of the proceeds—$1,500,000—to CRE Niagara PH, CRE Niagara PH— under the direction and control of Cerberus and Club Exploria—transferred the proceeds to Club Exploria for no consideration and that such agreement between CRE Niagara PH and Club Exploria was not made at arm's length.

**VI.**   **Defendants Continue to Breach the Agreements.**

142.   Shortly after entering into the Supplemental Agreement, RGI once again requested that Cerberus and Club Exploria reintroduce the successful "Profit Recovery" program, restore amenity hours and member access, resume helping members with outside timeshare exchanges, re-create the link between Collections and Reservations, re-authorize different departments at the Resort to work with one another (or with those departments which had been collapsed into Orlando), and take other steps to reduce the Schedule 2 Shortfall.  Defendants, however, refused to act or comply with the Supplemental Agreement, except by transferring the Excluded Assets to RGI and belatedly performing certain post-closing obligations under the UAPA.  Instead, Defendants continued to violate the Transaction Agreements, including, but not limited to, Section

44

5.1 of the Participation Agreement, Section 6.11 of the UAPA, and Section 3 of the Servicing Agreement.

143.    As a result, more and more Participation Portfolio obligors ceased making their payments and were canceled, continuing to impact the Schedule 2 Shortfall in the month of their default and in all the following months until maturity.

144.    Beginning in February 2019, RGI became aware of an increasing number of complaints that units at the Resort, which Club Exploria had assigned to Participation Portfolio obligors, were dirty or substandard, directly leading to additional delinquencies in the Participation Portfolio.

145.    By February 2019, Cerberus and Club Exploria acknowledged to RGI that the Resort's Servicing Platform had become so debilitated that they could no longer adequately perform the data processing, automated service bureau, payment posting, lock box, and merchant processing functions required under the Servicing Agreement.  Defendants also acknowledged that taking Collectors and Financial Services personnel away from their duties and obligations under the Servicing, Collection and Enforcement Policies and Procedures set forth on Schedule 1 had contributed to the growing Schedule 2 Shortfall.

146.    Club Exploria informed RGI that they could not afford to rebuild the Resort's Servicing Platform so as to restore Defendants' obligations under the Servicing Agreement. Instead, Defendants intended to outsource certain Servicing Platform functions to the Concord Servicing Corporation ("Concord"), an automated service bureau with expertise in timeshare portfolios which was already servicing other accounts for Club Exploria.

147.    Under the Transaction Agreements, Defendants needed RGI's consent to outsource these functions to Concord.  In exchange for its consent, RGI demanded that Defendants enter into

a new agreement whereby Defendants would, yet again, affirm their obligations under the Transaction Agreements, as well as taking on additional obligations.

148.    The PSQ Agreement also affirmed that CRE Bushkill would remain the "Servicer" under the Transaction Agreements and continue to receive a monthly fee from RGI, and that CRE could merely "hire Concord as sub-servicer" to perform certain limited, automated servicing functions.   Thus, CRE Bushkill remained obligated to RGI to comply with the Transaction Agreements in all respects, including in performing the functions that it had hired Concord to perform on its behalf.

149.    The PSQ Agreement was executed by J. Richard Budd—a principal of Cerberus— in his capacity as CEO of CRE Bushkill on February 21, 2019.  A true and correct copy of the PSQ Agreement is attached hereto as **Exhibit E**.

150.    Despite the PSQ Agreement ostensibly being between CRE Bushkill and RGI, it reflects, on its face, that Cerberus's alter ego, Club Exploria, was the true party in interest.  For example, CRE Bushkill listed Club Exploria employees or officers as not only Concord's primary contact, but also their point of contact for information technology, invoicing, accounting, customer service, collections, original documents, account histories, reservations, legal/compliance, risk, and fraud.  The PSQ Agreement also showed that CRE Bushkill's two points of contact for official "signoff" were both Club Exploria employees.  Moreover, the official client contact address was at Club Exploria's offices in Clermont, Florida—not CRE Bushkill's offices in Bushkill, Pennsylvania.

151.    Among the duties that CRE Bushkill was required to perform under the Servicing Agreement was automated credit reporting for the obligors under the timeshare contracts.  This credit bureau reporting was an important inducement for members to stay current with their

obligations to avoid a negative impact on their credit scores.  CRE Bushkill hired Concord to perform this function on CRE Bushkill's behalf, which was affirmed in the PSQ Agreement. Nevertheless, Concord failed to fulfill its credit reporting obligations under the Servicing and PSQ Agreements in the first four months following its engagement, despite repeated admonitions from RGI to CRE Bushkill.  Upon information and belief, CRE Bushkill's failure to do so contributed directly to increased delinquencies and the Schedule 2 Shortfall.

152.    In March 2019, Club Exploria discontinued RGI's "downgrades" practice, whereby delinquent members who were unable to afford their timeshare payments would be transferred to a less expensive alternative that would allow them to continue vacationing, and to resume payments at a reduced level.  This practice was part of the "Servicing, Collections and Enforcement Policies and Procedures" that Defendants had explicitly agreed to continue in Section 3.2(a) of the Servicing Agreement.  Upon information and belief, this policy change was intended to increase cancelations—with the effect of increasing the Schedule 2 Shortfall—and free up inventory that Defendants could use for Club Exploria's Membership Program, or borrow against to obtain desperately needed cash.  Although unknown to RGI at the time, Club Exploria subsequently disclosed, on a February 14, 2020 phone call, that Club Exploria had changed the registration of the Resort's inventory so that it was now part of Club Exploria's Membership Program, and, as a result, Defendants could not possibly complete the downgrades.

153.    By April 2019, RGI also learned of additional operational changes that significantly decreased customer satisfaction while also increasing shortfalls, delinquencies, and Participation Portfolio obligor payment stoppages and cancelations, and again violated the Transaction Agreements, including, among others, Section 5.1 of the Participation Agreement and Section 6.11 of the UAPA, which required Cerberus—through the CRE Subsidiaries—to provide members with

the benefit of the use and enjoyment of the Resort, continuing the corruption of customer service and fulfillment, which was systematically degrading the Participation Portfolio.

154.    *First*, Cerberus, through its alter ego Club Exploria, caused CRE Bushkill to limit day access for members.  Day access was a longstanding and extremely popular program at the Resort that allowed members to visit and take advantage of the Resort's amenities (including numerous "pay-for" amenities) outside of the members' regularly scheduled vacation.  Many of the members, including Participation Portfolio obligors, would regularly take advantage of this policy to enjoy additional time at the Resort.  RGI found that during its 11-year period of operating the Resort that this policy lead to higher overall customer satisfaction—something that reduced delinquency and made members more likely to upgrade to more expensive plans—in addition to the extra money brought in by the significant use of the "pay-for" amenities.

155.    *Second*, Cerberus, through its alter ego Club Exploria, informed Participation Portfolio obligors that they would lose their reservation priority unless they "upgraded" to a membership in the new Club Exploria Membership Program.  Other members complained that Club Exploria's salespeople were denying them day use of the Resort as a threat to get Participation Portfolio obligors to "upgrade" to the Membership Program.  Members who were told that they were not entitled to the benefits they had previously enjoyed, and had contracted for, instead of being forced to upgrade were more likely to cancel their contract.  Indeed, under Cerberus and Club Exploria's watch, Participation Portfolio upgrades plummeted while Participation Portfolio obligor delinquencies and cancellations soared.

156.    The resulting reduction in customer satisfaction is strongly reflected in Club Exploria's failure to obtain BBB accreditation and the 175 BBB complaints from consumers.  For example, a customer complained to the BBB that the "[Club] Exploria sales representative lied to

48

us and manipulated us into a timeshare that we did not want." The customer also noted that Club Exploria informed the customer—a Fairway member—that their current contract "was basically useless," that it "offered us no benefits," and that "it would be more beneficial for us to upgrade our lease and buy into Club Exploria."[2]

157. Concord's servicing system stores customer complaints which also reflect how Defendants' conduct negatively affected the Payment Stream. For example:

     a. On June 11, 2019, a customer indicated that they defaulted because they were "unable to get reservations" and later complained that they were informed that they must "buy into Club Exploria['s] [Membership Program] to cure Reservation issues."

     b. On August 13, 2019, a customer refused to pay after he and his parents had separately been informed that "Club [Exploria] members now have priority over [them]."

     c. On January 21, 2020, a longtime customer "stopped paying because [she] could never get a reservation once Reservations was shut down in Bushkill and transferred to Florida."

158. Upon information and belief there were many more members with similar complaints who either became delinquent or stopped paying all together as a result of Defendants' actions.

159. Not only did Cerberus and Club Exploria's practices violate the members' rights to use and enjoyment of their benefits, in violation of the Transaction Agreements, but it also constituted improper interference with the members' contracts—to which RGI was a third-party

---

[2] *See* https://www.bbb.org/us/fl/clermont/profile/vacation-timeshare/club-exploria-llc-0733-1008247/complaints (last accessed April 13, 2020).

beneficiary. Defendants' interference was in bad faith and malicious given that, among other things, Defendants' practices inured only for the benefit of Cerberus and Club Exploria, and to the detriment of the CRE Subsidiaries. Further, pursuant to Section 5.4(b) of the Participation Agreement, RGI obtained the right, but not the obligation, to "put" the improperly-interfered with contracts, at par value; however, this remedy deprives RGI of the future interest payments to which it would have been entitled had Defendants not interfered with these contracts.

160.    As a result of these changes, as well as Defendants' ongoing defaults, the Schedule 2 Shortfall continued to increase. By the end of April 2019, it had reached $1.5 million. Additionally, Cerberus and Club Exploria's continued violations of the members' rights to use and enjoyment of their benefits was increasing the risk that Participation Portfolio obligors might seek Payment Stream refunds.

## VII.    Cerberus and Club Exploria Induce RGI to Enter Into A Second Financing Agreement As Customer Service Continues to Decline.

161.    In late April 2019, Cerberus, acting through its alter ego Club Exploria, asked RGI to make another draw against the Hypothecation Loan, for "as much as possible," which Cerberus proposed again would be split evenly between RGI and CRE Niagara PH. As with the first financing agreement, upon CRE Niagara PH's receipt of its portion of the loan proceed, Cerberus would cause it to transfer those funds, without consideration, to Club Exploria.

162.    RGI declined to borrow any more money on the Hypothecation Loan to pre-pay the Defendants a participation to which the Defendants were not entitled because of their continued violations, and also given the delays and interest costs associated with that borrowing. Faced with this reluctance, in May 2019, Cerberus and Club Exploria turned to aggressive tactics, threatening to cause CRE Bushkill to impose significant financial burdens on its members, which, as

Defendants knew, would lead to increasing delinquencies and cancellations and further degrade the Participation Portfolio, causing further harm to RGI.

163. *First*, Defendants threatened to cause CRE Bushkill to withhold $78,925 in non-performance fees from RGI, in violation of the Transaction Agreements and in deviation from the prior course of conduct between the parties, and also threatened to arbitrarily alter the way non-performance fees were calculated going forward, again in a manner directly contrary to the Transaction Agreements and the prior course of conduct, to the detriment of the Payment Stream. This breach would have cost RGI hundreds of thousands of dollars in non-performance fees over the life of the Payment Stream. Although RGI made clear that this would be a violation of the Transaction Agreements, Cerberus and Club Exploria nonetheless directed CRE Bushkill to withhold $78,925 from RGI's May 2019 payment.

164. *Second*, Defendants threatened to cause CRE Bushkill to significantly increase the Participation Portfolio obligors' 2020 timeshare maintenance fees (billed in 2019). Because maintenance fees were not included in the Participation Portfolio, they would go directly to Defendants.

165. *Third*, and most menacing, Defendants threatened to cause CRE Bushkill to impose an arbitrary timeshare "special assessment" on the Participation Portfolio obligors.

166. RGI was aware that Cerberus and Club Exploria were increasing financial burdens on the Participation Portfolio obligors at the same time that these consumers were suffering from the Club Exploria's many operational changes—in breach of the Transaction Agreements—that had significantly decreased customer satisfaction. This would have a devastating effect on the Participation Portfolio and lead to a further increase in the Schedule 2 Shortfall. Club Exploria's threats to have CRE Bushkill impose these draconian burdens on the Participation Portfolio

51

members, and thereby to further damage RGI, were intended to coerce RGI to borrow as much as they could on the Hypothecation Loan.

167.    To induce RGI to enter into the loan, Cerberus and Club Exploria then made RGI a number of promises that they had no intention of keeping.  Specifically, in a meeting on or around May 9, 2019, Phil Davis—CFO of Club Exploria and the CRE Subsidiaries—and Michael J. Smith—the Vice President of Club Exploria—promised RGI that upon receipt of the funds, they would:  (1) invest the proceeds in the Resort for improvements and operations; (2) cause CRE Bushkill to reintroduce the successful "Profit Recovery" program; and (3) take other steps to reduce the Schedule 2 Shortfall.

168.    These promises were important to RGI because RGI knew that such actions would mitigate the ever-growing Schedule 2 Shortfall, prevent further degradation of the Participation Portfolio, and diminish the impact of Cerberus and Club Exploria's violations of the members' rights to use and enjoyment of their benefits.  However, while Cerberus and Club Exploria made these representations intending for RGI to rely on them and borrow additional funds, Defendants also knew them to be false when made.  RGI, upon receiving these promises from Cerberus and Club Exploria did, in fact, reasonably and justifiably rely on the promises by agreeing to borrow an additional $6,000,000 from Western Alliance Bank to be split with Defendants after reimbursement to RGI for the $78,925 in non-performance fees that Defendants had improperly withheld, with $2,921,075 wired directly by Western Alliance Bank to Club Exploria.  In reliance upon Defendants' promises, RGI also abstained from bringing suit or otherwise enforcing its rights under the Transaction Agreements.

169.    Upon information and belief, CRE Niagara PH did not receive any consideration for its agreement to have the funds to which it was contractually entitled transferred to Club

Exploria.  Additionally, upon information and belief, CRE Niagara PH's agreement with Club Exploria to transfer its share of the draw was not negotiated at arm's length.

170.    In connection with borrowing these additional funds, on July 4, 2019, RGI entered into the Second Supplemental Agreement.  Mr. Davis executed the Second Supplemental Agreement on behalf of CRE Niagara PH, CRE Bushkill, and Club Exploria.  His signatures indicate that he was holding the position of Chief Financial Officer of each entity.  A true and correct copy of the Second Supplemental Agreement is attached hereto as **Exhibit F**.

171.    In the Second Supplemental Agreement, among other things, CRE Niagara PH, CRE Bushkill, and RGI reaffirmed the requirements and obligations already existing under the Participation Agreement, the Servicing Agreement, and the Supplemental Agreement and further agreed that:  (1) RGI would also reduce CRE Niagara PH's loan split by $78,925 to account for the improperly withheld non-performance fees; (2) clarified that the non-performance fees were to be calculated in the manner previously applied by the parties; and (3) Defendants would not increase maintenance fees or impose a "special assessment" on the Participation Portfolio obligors in 2020.  Club Exploria "warrant[ed] the performance of [CRE Bushkill] and [CRE Niagara PH]" with respect to these last two provisions, further demonstrating its domination and control over these entities.

172.    Despite its receipt of over $4.4 million in loan funds to use for Resort operations, Club Exploria continued its gross mismanagement and violations of the Transaction Agreements. Through these failings, the Schedule 2 Shortfall reached $2.1 million by August 2019, and the degradation of the Participation Portfolio continued.

173.    In light of this, RGI continued to demand that Club Exploria reinstate numerous of its collections policies, such as the Profit Recovery program.  Since the Closing, Cerberus—

through its alter ego Club Exploria—willfully caused the CRE Subsidiaries to cancel more than $19.8 million in contracts under the Participation Portfolio.  RGI projected that if Club Exploria reinstated the Profit Recovery program, and used it to work these contracts, it would reduce the Schedule 2 Shortfall by a minimum of $2,000,000 over the life of the Payment Stream, and far more if reinstatement of Profit Recovery was done in conjunction curing the gross mismanagement and other violations of the Transaction Agreements.  Cerberus and Club Exploria, nonetheless, were unresponsive to RGI's request, despite their prior fraudulent promises to reinstate the Profit Recovery program.

174.    RGI also continued to demand that Defendants cure the multiple violations of the Transaction Agreements which were contributing to the ever-increasing Schedule 2 Shortfall and ever-worsening degradation of the Participation Portfolio, as detailed herein, including but not limited to Section 5.1 of the Participation Agreement, Section 6.11 of the UAPA, and Section 3 of the Servicing Agreement.

175.    In October 2019, RGI met with Club Exploria's interim CFO, Michael J. Smith, at the Resort.  Upon information and belief, this was the first time since J. Richard Budd was terminated as Chairman of Club Exploria in April 2019 that a senior Club Exploria executive visited the Resort's now virtually empty offices and data center in Bushkill, Pennsylvania—what Cerberus had promised to RGI to use as Cerberus's "Corporate Headquarters" for its timeshare acquisitions.  In this meeting, Club Exploria admitted to RGI that Defendants had caused CRE Bushkill to deny Resort members day use of the amenities and caused its salesforce to interfere with contracts in the Participation Portfolio by denying them access to reservations or day-use unless they agreed to upgrade their contracts, as explained herein.  Mr. Smith also acknowledged that the Profit Recovery program was a requisite obligation under the Servicing Agreement and

agreed to "bring it up with Tom [Morris]."  During this meeting, RGI once again directed that Club Exploria reinstate CRE Bushkill's Profit Recovery program, as well as cease and cure the other multiple violations of the Agreements, including, but not limited to, Section 5.1 of the Participation Agreement, Section 6.11 of the UAPA, and Section 3 of the Servicing Agreement.

176.    In November 2019, however, Club Exploria informed RGI that it would not reinstate CRE Bushkill's Profit Recovery program at any point, nor would it address the other multiple breaches of the Transaction Agreements.

177.    In fact, on February 14, 2020, RGI learned that Cerberus and Club Exploria, despite their promises to reinstate the Profit Recovery program, could never have done so effectively, because in 2018 Cerberus and Club Exploria had caused CRE Bushkill to register the Resort's inventory as Club Exploria inventory for use in Club Exploria's own Membership Program.  As a result, Cerberus and Club Exploria never could have successfully induced the members to reinstate their membership, because the inventory had been converted and/or sold elsewhere.  RGI learned that this was also the reason behind Club Exploria not allowing Downgrades starting in March 2019.

## VIII.   **RGI Serves Defendants With Initial Default Notices.**

178.    In light of Defendants' numerous ongoing defaults under the Agreements, and specifically prompted by Defendants' refusal to reinstate the Profit Recovery program, on November 7, 2019, RGI sent three default notices to Defendants.

179.    *First*, RGI sent a default notice under the Servicing Agreement to CRE Bushkill (the "First SA Default Notice").  This default notice specifically informed CRE Bushkill that a Cash Flow Shortfall Default had existed since May 2018 and had "steadily grown more severe," reaching $2,461,900 as of October 31, 2019.  The default letter noted that during the period of

default, RGI had provided CRE Bushkill with "dozens" of "written directives" that CRE Bushkill did not follow.  These directives included, but were not limited to, restoring RGI's Profit Recovery program, downgrade procedures, restoring the reservation and exchange blocking and unblocking procedures, and restoring the timeshare loan account closings and write-offs procedures.  The default notice also demanded to be immediately informed of any steps being taken to cure the ongoing defaults.

180.    *Second*, RGI sent a default notice under the Participation Agreement to Cerberus and CRE Bushkill (the "First PA Default Notice").  Through this notice, RGI informed Cerberus and CRE Bushkill that numerous Holder Defaults existed, including but not limited to, tortiously interfering with the underlying timeshare contracts, failing to confirm reservations for members, maintain amenity access, and provide customer service at a level comparable to that provided by RGI.  The default notice also demanded to be immediately informed of any steps being taken to cure the ongoing defaults.

181.    *Third*, RGI sent a default notice under the UAPA to Cerberus (the "First UAPA Default Notice").  T███████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████

182.    On November 20, 2019, CRE Bushkill responded to the three default notices issued by RGI—including the First UAPA Default Notice, a notice to which CRE Bushkill was not a party.  CRE Bushkill's response denied certain of the allegations (although not the $2,461,900 Schedule 2 Shortfall, which constitutes a Cash Flow Shortfall Default under the Servicing

Agreement), contended that the Schedule 2 Benchmarks were unrealistic, and made no indication that it would take any actions whatsoever to cure the ongoing defaults.

183.     Tellingly, despite denying some of the allegations in the default notices, CRE Bushkill had never issued the Annual Officer's Certificate as required by Section 3.2 of the Servicing Agreement, certifying that during the preceding year CRE Bushkill "has performed and observed all of its obligations under this Agreement in all material respects" and that either no defaults had occurred or that any default had been cured.  CRE Bushkill failed to issue this certification because it knew that it could not accurately certify that (1) it was complying with its obligations under the Servicing Agreement, and (2) there had not been any Servicer/Resort Defaults during the year.

184.     Shortly thereafter, on December 18, 2019, RGI sent another notice of default to Cerberus and CRE Bushkill under the Servicing Agreement, the Participation Agreement, and the UAPA (the "Second Default Notice").  In the default notice, RGI made clear that the Schedule 2 Benchmarks were realistic projections—as evidenced by, among other things, Cerberus's extensive due diligence utilizing its own expertise as well as that of its outside experts, Quanta and Crowe Horwath, and by Western Alliances Bank's review.  RGI also reiterated its request that Defendants honor their contractual obligations by, among other things, restoring RGI's Profit Recovery, downgrade, reservation and exchange blocking and unblocking, and timeshare loan account closings and write-offs procedures.  RGI went as far as to offer to advance $15,000 per month in excess of its standard Servicing Fees to restore these procedures as RGI knew that such action would result in a significant increase in Participation Portfolio revenues.

185.     Following receipt of the Second Default Notice, Defendants took no action to alter their procedures at the Resort.  Indeed, Defendants did not even respond to RGI's offer.

186.     Having failed to receive any response whatsoever, on January 10, 2020, RGI sent another default notice to Cerberus and CRE Bushkill (the "Third Default Notice").  In this letter, RGI withdrew its good faith offer of a $15,000 per month advancement.  RGI noted that the Cash Flow Shortfall Default not only continued, but had increased to more than $2.8 million as of December 31, 2019, and reiterated its request for Defendants to comply with their obligations under the Agreements.

187.     As with the Second Default Notice, following receipt of the Third Default Notice, Defendants neither responded to RGI nor took any material action to fix the ongoing defaults.

## IX.     Unwilling To Remedy Defaults, Defendants Repudiate Their Contractual Obligations.

188.     Rather than take good faith actions to remedy the defaults identified by RGI in the various default notices, Defendants instead chose to escalate the issues by committing additional defaults, and ultimately repudiating their obligations under each of the Transaction Agreements.

189.     In January 2020, RGI learned that Club Exploria had ordered CRE Bushkill to shut down approximately 100 units at Tree Tops.  This had an adverse impact on reservations and customer service, further negatively impacted the Participation Portfolio, and was another egregious violation of the members' rights to use, occupy and enjoy their benefits.  It also was another clear default under the Transaction Agreements.

190.     Shortly thereafter, RGI also became aware that CRE Bushkill—at Cerberus and Club Exploria's direction—had completely abandoned its obligation under the Agreements to maintain the Portfolio Collections and Customer Services in Bushkill, Pennsylvania and, in fact, terminated the entire Collections and Financial Services Department on March 24, 2020.  Such actions constituted not only intentional and willful breaches of the Agreements, but also an abject repudiation of Defendants' obligations thereunder.

191.    Club Exploria has since completely cut off communications with RGI concerning operation of the Resort.  Despite daily requests for information and attempts to achieve remediation and reconciliation by RGI, and Defendants' obligations to follow RGI's reasonable directives in the event of a shortfall, Club Exploria has refused to speak to, or work with, RGI.  Indeed, Club Exploria is taking draconian measures specifically aimed at harming RGI.  Among other actions, Club Exploria has closed the Resort's Collections department and abandoned virtually all of the few remaining policies and procedures which it had been following prior to March 24, despite keeping all other Club Exploria collections operations open.  Timeshare members who made Participation Portfolio payments in reliance upon special reservations have reported being unable to occupy.  And the decline in collections activity has been disastrous for the Participation Portfolio.  Among other things, rather than following the contractually dictated Schedule 1 procedures that allow for flexible payment options and dictate personal contact with obligors, which would mitigate or eliminate damage inflicted by the COVID-19 crisis, Defendants have abandoned them almost entirely.  Moreover, while Defendants could have continued operations on a remote basis legally and safely, they refused to do so.

192.    Upon information and belief, Defendants have maliciously taken these actions in an attempt to force RGI to buy them out of their Participation Interest and to take over the servicing of the Participation Portfolio.

**X.    Following Defendants' Repudiation Of The Agreements
        RGI Issues Final Default Notice.**

193.    Unable to receive any substantive response from Defendants or to see any attempt to cure the ongoing defaults, on March 30, 2020, RGI sent a final default notice to Cerberus, CRE Bushkill, CRE Niagara PH, and Club Exploria (the "Final Default Notice").  In the Final Default Notice, RGI put Defendants on notice that not only were the previously articulated defaults still

ongoing, but that additional defaults had been triggered since the first default notices, and that RGI viewed Defendants as having anticipatorily repudiated each of the Agreements.  By virtue of this repudiation, RGI notified Defendants that they had lost their participation interest in the Payment Stream, and that they were liable for $27,500,000 million in remaining collections from the Participation Portfolio, alerted Defendants to their indemnification obligations under Section 4.1 of the Servicing Agreement, 6.11 of the UAPA, and Section 7.1 of the Participation Agreement.

194.    The Final Default Notice also put Defendants on notice that RGI believed that it had been fraudulently induced to borrow the $9,000,000 from Western Alliance Bank in connection with the Financing Agreements.

195.    RGI has not received a meaningful response to the Final Default Notice.

196.    Through the Default Notices, including but not limited to the Final Default Notice, RGI provided Defendants with notification of claims on breaches of the Transaction Agreements and Supplemental Agreement, as well as fraudulent inducement.  RGI thereby notified Defendants of their indemnification obligations and that RGI's claims were based on willful misconduct, fraud, and/or misrepresentation.  As such any contractual limitation in time or amount does not apply to such claims.

## XI.    Defendants' Failure To Cure Ongoing Defaults Has Caused RGI Millions Of Dollars Of Damages.

197.    The various ongoing and uncured defaults to date have cost, and will continue to cost, RGI millions of dollars, as the degradation and ultimately the destruction of the Participation Portfolio accelerates.

198.    Among other injuries, RGI has been damaged through the Schedule 2 Shortfall, which as of May 1, 2020, was approximately $4,421,000 million, and growing by the month.  This shortfall currently constitutes—and has for nearly two years—a Cash Flow Shortfall Default under

the terms of the Servicing Agreement.  Under the terms of the Servicing Agreement, a Cash Flow Shortfall Default exists where either collections fail to reach the Schedule 2 Benchmarks in three consecutive months, or any four months in a twelve month period.  Far exceeding that standard, collections have failed to reach the Schedule 2 Benchmarks in *any month since March 2018*.  In recent months, this monthly Schedule 2 Shortfall has approached and exceeded $200,000.

199.    Moreover, Defendants' complete abandonment of their operations in Bushkill, and their active collections therefrom under the Participation Portfolio, has resulted in the amount of payments more than 60 days delinquent under the Participation Portfolio to skyrocket by more than $1.5 million.

200.    Further, based on Cerberus and Club Exploria's fraudulent statements that induced RGI to borrow $9,000,000 against the Hypothecation Loan from Western Alliance Bank, RGI has also suffered a delayed payoff date for the Hypothecation Loan, incurred interest payments, and delayed the time in which RGI could reduce Defendants' participation amount as a result of their defaults.

**XII.    Defendants Fraudulently Induce RGI To Not Initiate Litigation**

201.    Defendants repeatedly and fraudulently made misrepresentations to RGI to induce it not to bring suit.  RGI reasonably relied on these representations in not bringing suit.  For example, in the Supplemental Agreements and the PSQ Agreement, Defendants reaffirmed their obligations under the Transaction Agreements, representing that they would bring themselves back into compliance, but did not do so.

202.    Defendants repeated these misrepresentations in numerous meetings and phone calls.  For example, in February 2018 meetings with Rogers, Budd, and Robertson, Defendants stated that any defaults were simply the result of "temporary growing pains."  On or about August 14, 2018, RGI met with Budd, of Cerberus, who promised to cure its defaults under the Agreement,

including restoring amenity hours, reinstating the profit recovery program, restoring communications between departments, and restoring collections and sales procedures, which would cure Defendants' shortfalls.  At a meeting on or about September 13, 2018, Budd again repeated these promises.  In a meeting on or around January 30, 2019, Budd again falsely promised that the profit recovery program would be reinstated, and that Defendants would look into other issues with Defendants' defaults.  And in a phone call from Michael Smith and Phil Davis on May 9, 2019, Defendants again promised to restore profit recovery and look into more recent customer complaints, including Defendants' interference with contracts by telling members that they needed to upgrade.

203.    Defendants' representations, which were false when made and were intended to induce RGI into not bringing legal action or enforcing its rights under the Agreements, and RGI reasonably relied upon them in not bringing suit or otherwise enforcing its rights under the Agreements.

### CAUSES OF ACTION

### COUNT I
**(Breach of the UAPA/Indemnification
Against CRE Bushkill, Cerberus, And Club Exploria)**

204.    RGI repeats and realleges the allegations set forth in the preceding paragraphs 1 through 203 as if fully set forth herein.

205.    The UAPA, dated May 19, 2017, constitutes a valid and binding contract between RGI and CRE Niagara.

206.    As detailed herein, Cerberus and Club Exploria are liable under the terms of the UAPA as CRE Niagara's alter egos.  Cerberus and Club Exploria are CRE Niagara's alter egos for purpose of this claim because they exercised complete domination and control over CRE Niagara in connection with its obligations under the UAPA, and they exercised such domination

and control to commit a fraud or wrong against RGI that resulted in injury to RGI.  Upon information and belief, Cerberus and Club Exploria's domination and control over CRE Niagara is evidenced by:   (i) their disregard of corporate formalities; (ii) CRE Niagara's inadequate capitalization; (iii) CRE Niagara's commingling of funds with Club Exploria; (iv) the overlap in ownership, officers, directors, and personnel; (v) common office space and address; (vi) CRE Niagara's complete lack of discretion over its own business conduct; (vii) Cerberus, Club Exploria, and CRE Niagara's failure to deal at arms' length; and (viii) the intermingling of property. Indeed, through the Servicing Agreement, Cerberus has acknowledged that its "wholly-owned subsidiaries" and "other Affiliates"—such as Club Exploria and CRE Niagara—"are Controlled, directly or indirectly, by Cerberus Capital Management, LP."  Upon information and belief, Cerberus, Club Exploria, and CRE Niagara acted as a single economic entity.

207.   As detailed herein, beginning with the execution of the UAPA in May 2017, Cerberus acted as CRE Niagara's alter ego by, among other things, performing its obligations under the UAPA.  Similarly, as detailed herein, following Cerberus' acquisition of Club Exploria in November 2017, Club Exploria acted as CRE Niagara's alter ego by, among other things, performing its obligations under the UAPA.

208.   ███████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████.

209.    More specifically, CRE Niagara, Cerberus, and/or Club Exploria breached the UAPA's use and enjoyment obligations by the conduct alleged herein, including but not limited to:  (a) cutting resort availability and hours, (b) restricting access to amenities, (c) restricting forms of payment, (d) curtailing membership referral and owner rental programs, and (e) making it difficult to obtain reservations.

210.    Similarly, CRE Niagara, Cerberus, and/or Club Exploria breached the UAPA's materially equivalent maintenance and operations obligations by the conduct alleged herein, including but not limited to, failing to maintain the cleanliness of units at the Resort provided to Portfolio obligors, and the amenities.

211.    Additionally, CRE Niagara, Cerberus, and/or Club Exploria breached the UAPA's materially equivalent customer service obligations by the conduct alleged herein, including but not limited to:  (a) suspending customer service for timeshare exchanges, (b) making it more difficult to obtain reservations, and (c) cutting staff to such an extent that an insufficient number were available to handle customer needs.

212.    Defendants also breached the Participation Agreement, which was incorporated into the UAPA, by the conduct alleged herein, including by:  (i) failing to provide the obligors of the Timeshare Contracts and Fairway Contracts for Deed with the use and enjoyment to which they are entitled under those agreements in violation of Section 5.1(i); (ii) failing to maintain and operate the Resort in a manner that was, at minimum, materially equivalent to how the Resort were being operated by RGI prior to the Closing in violation of Section 5.2(ii); and (iii) failing to provide

the obligors of the Timeshare Contracts and the Fairway Contracts for Deed with customer service at an overall level of quality that was, at a minimum, materially equivalent to that provided by RGI prior to the Closing.

213.    Defendants also breached the Servicing Agreement, which was incorporated into the UAPA, by the conduct alleged herein, including by:  (i) failing to comply with the Servicing, Collection and Enforcement Policies and Procedures in violation of Section 3.2(a); (ii) failing to prove good faith diligence in servicing the Timeshare Contracts and the Fairway Contracts for Deed in violation of Section 3.2(d); (iii) abandoning its servicing and collections obligations in violation of Section 3.2(e); (iv) failing to comply with RGI's directives following the existence of a Servicer/Resort Default by virtue of the ongoing Cash Flow Shortfall Default; (v) failing to comply with its reporting obligations to RGI in violation of Section 3.11(a) and 3.11(c); (vi) failing to comply with the Annual Officer's Certificate requirement in violation of Section 3.12 by not submitting these certifications to RGI; and (vii) being wholly unable to certify under the Annual Officer's Certificate requirement that Servicer has performed and observed all its obligations in all material respects, and either has committed no default or has cured any default.

214.    Through the Final Default Letter, among others, RGI provided Defendants with notification of its indemnification claims under the UAPA.  Defendants did not meaningfully respond within thirty days to the substance of RGI's claims.  As such, RGI hereby pursues all remedies available at law for Defendants' breaches of the UAPA, including indemnification.

215.    Beyond the specific contractual breaches detailed herein, CRE Niagara, Cerberus, and/or Club Exploria have repudiated their contractual obligations under the UAPA.  Despite RGI's request for assurances that it would perform as required—through not only the three default notices, but also hundreds of informal requests that they comply with their contractual

obligations—CRE Niagara, Cerberus, and/or Club Exploria have absolutely refused to perform their obligations.  Such refusal was positive and unequivocal.

216.    RGI performed all material obligations under the UAPA.

217.    RGI is entitled to indemnification under the UAPA.

218.    Collectively, CRE Niagara, Cerberus, and Club Exploria's numerous breaches, and ultimate repudiation, of the UAPA and their obligations thereunder, they have caused destruction to, and degradation of, the Payment Stream under the Participation Portfolio.

219.    As a direct and proximate result of CRE Niagara, Cerberus, and/or Club Exploria's breach of contract, RGI has been damaged in an amount to be proven at trial, but not less than $30 million, together with interest thereon, attorneys' fees, and costs.

## COUNT II
### (Breach of Implied Covenant of Good Faith & Fair Dealing Against Defendants)

220.    RGI repeats and realleges the allegations set forth in the preceding paragraphs 1 through 219 as if set forth fully herein.

221.    On May 18, 2017, RGI entered into the UAPA with CRE Niagara.  The UAPA constitutes a valid and binding contract that govern the terms of the parties' relationship.

222.    As detailed herein, Cerberus and Club Exploria are liable under the terms of the UAPA as CRE Niagara's alter egos.  Cerberus and Club Exploria are CRE Niagara's alter egos for purpose of this claim because they exercised complete domination and control over CRE Niagara in connection with its obligations under the UAPA, and they exercised such domination and control to commit a fraud or wrong against RGI that resulted in injury to RGI.  Upon information and belief, Cerberus and Club Exploria's domination and control over CRE Niagara is evidenced by:   (i) their disregard of corporate formalities; (ii) CRE Niagara's inadequate capitalization; (iii) CRE Niagara's commingling of funds with Club Exploria; (iv) the overlap in

ownership, officers, directors, and personnel; (v) common office space and address; (vi) CRE Niagara's complete lack of discretion over its own business conduct; (vii) Defendants' failure to deal with each other at arms' length; and (viii) the intermingling of property. Indeed, through the Servicing Agreement, Cerberus has acknowledged that (i) its "wholly-owned subsidiaries" and "other Affiliates"—such as CRE Niagara—"are Controlled, directly or indirectly, by Cerberus Capital Management, LP."   Upon information and belief, Cerberus, Club Exploria, and CRE Niagara operate as a single economic entity.

223.    By virtue of the UAPA, Defendants each owed RGI a duty of good faith and fair dealing.  Under this duty, Defendants promised not to frustrate the purpose of, or deprive the other party of the fruits of, the contract.  This implied covenant of good faith and fair dealing additionally includes a promise that parties vested with discretion under an agreement act rationally, legitimately, and in good faith.

224.    Defendants violated this duty by applying the discretion given to them under the UAPA, which incorporated the Servicing Agreement and the Participation Agreement, to manage the Resort.  They did so by applying such discretion in bad faith to maximize their own personal profits while depriving RGI of the fruits of their contract.

225.    All of the breaches alleged herein by Defendants were willful and malicious in nature.  As such, any contractual restrictions or limitations on such claims are not enforceable.

226.    As a direct and proximate result of Defendants' breach of the implied covenant of good faith and fair dealing, RGI has been damaged in an amount to be proven at trial of not less than $30 million, together with interest thereon, attorneys' fees, and costs.

**COUNT III**
**(Declaratory Judgment Against Defendants)**

227.   RGI repeats and realleges the allegations set forth in the preceding paragraphs 1 through 226 as if fully set forth herein.

228.   ████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████

     ████████████████████████████████████████

████████████████████████████████████████████

███████████████████████

     ████████████████████████████████████████

████████████████████████████████████████████

██████████████████████

231.   RGI is at risk of a real and immediate injury or threat of injury that will be caused by Defendants absent the issuance of a declaratory judgment.

232.     Accordingly, RGI is entitled to a declaration that it has not breached the UAPA by, among other things, the conduct alleged in Defendants' November 20, 2019 letter.

## COUNT IV
## (In the Alternative, Tortious Interference with Contract Against Cerberus)

233.     RGI repeats and realleges the allegations set forth in the preceding paragraphs 1 through 232 as if fully set forth herein.

234.     On May 18, 2017, RGI entered into the UAPA with Niagara.  The UAPA constitutes a valid and binding contract that govern the terms of the parties' relationship.

235.     Cerberus, as the parent company of CRE Niagara, negotiated this contract on behalf of CRE Niagara.  ████████████████████████████████████████████████████ ████████████████████████████████████████  As such, Cerberus was aware of the UAPA.

236.     As detailed herein, with the knowledge of the existence and of terms of the UAPA, Cerberus intentionally and wrongfully procured CRE Niagara and/or Club Exploria's breach of the UAPA, to the detriment of CRE Niagara.

237.     Following such procurement, CRE Niagara and/or Club Exploria did, in fact, materially breach the UAPA, as detailed herein.  But for Cerberus's procurement, CRE Niagara and/or Club Exploria would not have breached the UAPA.

238.     These breaches, which Cerberus improperly procured, were contrary to the interests of CRE Niagara.  In particular, CRE Niagara was harmed through the reduction of the Payment Stream—of which CRE Niagara owns a Participation Interest.

239.     Cerberus acted wrongfully, with malice, and without justification or excuse.

240.     As a direct and proximate result of Cerberus's tortious conduct, RGI has been damaged in an amount to be proven at trial of not less than $30 million, together with interest thereon, attorneys' fees and costs.

241.    In addition, because Cerberus's actions were taken with a high degree of moral turpitude that demonstrates wanton dishonesty and complete indifference to civil obligations, RGI seeks punitive damages in an additional amount to be determined at trial.

## COUNT V
### (Fraudulent Inducement Against Cerberus)

242.    RGI repeats and realleges the allegations set forth in the preceding paragraphs 1 through 241 as if fully set forth herein.

243.    Cerberus fraudulently induced RGI to enter into the UAPA and to, thereby, sell its equity interests in Bushkill Group and other related assets to Cerberus, sell Cerberus a participation in the Payment Stream, and allow Cerberus to service the Participation Portfolio in exchange for a servicing fee.

244.    In May 2017, immediately prior to the execution of the UAPA, Cerberus made false representations of material fact.  Among other representations, Cerberus informed RGI that it was purchasing Bushkill Group to make it its large offices and data center in Bushkill, Pennsylvania the "Corporate Headquarters" of its timeshare holdings and that the (then-unnamed) second timeshare acquisition that it was in the process of completing would be to complement the Resort's business and would be run from Bushkill, Pennsylvania.  Upon information and belief, the second transaction referenced by Cerberus in these false statements was its acquisition of Club Exploria.

245.    At the time that Cerberus made these false representations of material fact, Cerberus knew they were untrue.

246.    Cerberus made these false representations of material fact with the intention RGI rely upon them.  In particular, Cerberus wanted RGI to rely on them so that it would sell Cerberus its equity interest in Bushkill Group, along with related assets, which Cerberus wanted to siphon for the purposes of growing Club Exploria's business.

247.    RGI did, in fact, justifiably rely upon these false representations of material fact. In so relying, RGI executed the UAPA.

248.    As a direct and proximate result of Cerberus's fraudulent inducement, RGI has been damaged in an amount to be proven at trial of not less than $30 million, together with interest thereon, attorneys' fees and costs.

249.    In addition, because Cerberus's actions were taken with a high degree of moral turpitude that demonstrates wanton dishonesty and complete indifference to civil obligations, RGI seeks punitive damages in an additional amount to be determined at trial.

## **PRAYER FOR RELIEF**

**WHEREFORE**, RGI is entitled to a judgment against Defendants awarding RGI:

1.    Compensatory damages in an amount to be determined at trial of not less than $30 million;

2.    Indemnification in an amount to be determined at trial;

3.    Punitive damages in an amount to be determined at trial;

4.    Costs and attorney's fees incurred in connection with this action;

5.    Pre- and post-judgment interest; and

6.    Such further and other relief as this Court deems just and proper.

Plaintiff respectfully demands a trial by jury of all issues so triable.

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

/s/ Thomas W. Briggs, Jr.
  Thomas W. Briggs, Jr. (#4076)
  Ryan D. Stottmann (#5237)
  Barnaby Grzaslewicz (#6037)
OF COUNSEL:
  1201 North Market Street
  P.O. Box 1347
KASOWITZ BENSON TORRES LLP
  Wilmington, DE  19899
David S. Rosner
  (302) 658-9200
Paul J. Burgo
Stephen Thomasch
  *Attorneys for Plaintiff*

1633 Broadway
New York, New York 10019
Tel.: (212) 506-1700
Fax: (212) 506-1800

May 18, 2020